676 A.2d 1036

WILLIAM AND ROSLYN SNYDER, PLAINTIFFS–RESPONDENTS, v. AMERICAN ASSOCIATION OF BLOOD BANKS, DEFENDANT–APPELLANT, AND HAROUTUNE MEKHJIAN, M.D., INDIVIDUALLY AND HAROUTUNE MEKHJIAN, M.D., P.C.; YOUNGICK LEE, M.D.; WILMO OREJOLA, M.D.; ANTHONY LOSARDO, M.D.; LEONARD SAVINO, M.D.; JOHN DOE, M.D., A FICTITIOUS NAME; RICHARD ROE, M.D., A FICTITIOUS NAME; JOHN ROE, M.D., A FICTITIOUS NAME; JOHN SMITH, M.D., A FICTITIOUS NAME; JOHN JONES, M.D., A FICTITIOUS NAME; ST. JOSEPH'S HOSPITAL; ST. JOSEPH'S BLOOD BANK; BERGEN COMMUNITY BLOOD CENTER, ANTHONY PASSARO, LAWRENCE WILKINSON, W BLOOD BANK, A FICTITIOUS NAME; DR. JOHN KALIAN; Y BLOOD BANK, A FICTITIOUS NAME; Z BLOOD BANK, A FICTITIOUS NAME; XYZ BLOOD BANK, A FICTITIOUS NAME; JANE DOE, A FICTITIOUS NAME; RICHARD ROE, A FICTITIOUS NAME; JOSEPH WILLIAMS, A FICTITIOUS NAME; JOSEPH ROGERS, A FICTITIOUS NAME; GREGORY SMITH, A FICTITIOUS NAME; JOSEPH SMITH, A FICTITIOUS NAME; JANE SMITH, A FICTITIOUS NAME; AND WILLIAM SMITH, A FICTITIOUS NAME; INDIVIDUALLY AND AS AGENTS, EMPLOYEES AND SERVANTS OF ST. JOSEPH'S HOSPITAL, DEFENDANTS.

Argued November 6, 1995—Decided June 4, 1996.

*Edwin R. Matthews* argued the cause for appellant (*Matthews, White, Giacumbo & Fischer* and *Budd, Larner, Gross, Rosenbaum, Greenberg & Sade,* attorneys; *Mr. Matthews, Mark D. Larner* and *Donald P. Jacobs,* on the briefs).

*George T. Baxter* argued the cause for respondents.

*Charles W. Wigginton* submitted a brief on behalf of *amicus curiae* Association of Tissue Banks (*Maley, Williamson & Hayden,* attorneys; *Mr. Wigginton* and *Burt A. Braverman,* a member of the District of Columbia bar, on the brief).

*William B. McGuire* submitted a brief on behalf of *amicus curiae* American Society of Association Executives (*Tompkins, McGuire & Wachenfeld,* attorneys).

*Susan M. Sharko* and *Laura A. Wefing* submitted a brief on behalf of *amicus curiae* College of American Pathologists (*Shanley & Fisher,* attorneys).

The opinion of the Court was delivered by

POLLOCK, J.

Plaintiff William Snyder contracted Acquired Immune Deficiency Syndrome (AIDS) from a transfusion of blood that the Bergen Community Blood Center (BCBC), a non-profit blood bank, had provided to St. Joseph's Hospital. The BCBC is a member of defendant, the American Association of Blood Banks (AABB), an association of blood banks and blood-banking professionals. The primary issue is whether the AABB owed a duty of care to

Snyder. A further issue is whether the AABB is entitled to charitable immunity under *N.J.S.A.* 2A:53–7.

In the Law Division, a jury found the AABB thirty-percent liable for Snyder's damages of $1,350,000, or $405,000. The Appellate Division affirmed. 282 *N.J.Super.* 23, 659 *A.*2d 482 (1995). We granted the AABB's petition for certification, 142 *N.J.* 517, 665 *A.*2d 1110 (1995), and now affirm.

I

On August 23, 1984, Snyder underwent open-heart surgery at St. Joseph's Hospital in Paterson. During the surgery he received transfusions of several units of blood platelets, including unit 29F0784, which BCBC had supplied to St. Joseph's.

At the time, no direct test existed to determine whether blood was infected with Human Immunodeficiency Virus (HIV), the cause of AIDS. Other means of making that determination, however, were available. Starting in 1985, the enzyme-linked immuno-absorbent-assay-screening test (the ELISA test) enabled blood banks to screen for HIV.

Under a nationwide "look-back" program instituted that year, blood banks could determine whether a prospective donor who tested positive for HIV had donated blood before the development of the ELISA test. As part of the "look-back" program sponsored by the AABB, BCBC ascertained in 1986 that the donor of unit 29F0784 was HIV positive. That same year BCBC so informed St. Joseph's Hospital. St. Joseph's, in turn, informed Snyder's doctor, who notified him in 1987. Snyder, who was not otherwise at risk, tested HIV positive. He has since contracted AIDS.

In February 1989, Snyder and his wife, Roslyn (collectively referred to as "plaintiffs"), filed a complaint in the Law Division against St. Joseph's, various physicians and other individuals, BCBC, and the AABB (collectively described as "defendants"). Plaintiffs asserted claims sounding in strict liability, breach of warranty, negligence, and consumer fraud. In the strict-liability

claim, Snyder alleged that he had been transfused with a defective blood product that could have been made safe through available blood tests and donor-screening techniques. According to the plaintiffs, the AABB, however, resisted implementation of those tests and techniques. Snyder further alleged that BCBC and the AABB negligently had enhanced his risk of contracting AIDS by failing to implement procedures to prevent HIV-infected donors from giving blood. The AABB denied plaintiffs' essential allegations and asserted the affirmative defense of charitable immunity.

In an earlier proceeding, the Law Division entered an order allowing plaintiffs to proceed with their negligence claim against the AABB. Further, the court ruled that plaintiffs were not entitled to discovery of BCBC's blood-donor records.

The Appellate Division agreed that plaintiffs could maintain their negligence action. *Snyder v. Mekhjian (Snyder I)*, 244 *N.J.Super.* 281, 290–93, 582 *A.*2d 307 (1990). Overruling the trial court, the Appellate Division allowed plaintiffs' discovery of the donor's records. We affirmed. 125 *N.J.* 328, 593 *A.*2d 318 (1991).

Ultimately, all defendants other than the AABB either settled or obtained dismissals. At the trial, the critical issue was whether the AABB had breached a duty of care to Snyder. Hence, the trial focused on the AABB's role in the blood-banking industry and the reasonableness of its response to increasing evidence that blood or blood products could transmit AIDS.

At the conclusion of an eight-week trial, the jury found that the AABB had been negligent in not recommending surrogate testing. Surrogate testing refers to identifying people at risk for a disease by testing for some symptom or characteristic manifested by a majority of people who have contracted or are at risk of contracting the disease. In the early 1980s, one available surrogate test for HIV infected blood was that for the antibody to the hepatitis B core antigen (the HBc antibody).

The jury further found that the AABB's negligence was a substantial factor in causing Snyder to contract HIV. It also found that the AABB was thirty-percent liable for plaintiffs' injuries.

The Appellate Division affirmed. Writing for the court, Judge Pressler stated that, on the interlocutory appeal, the court had determined that the AABB owed Snyder a duty of care, and that the law of the case precluded a different determination. 282 *N.J.Super.* at 43, 659 *A.*2d 482.

The Appellate Division explained that the "unique and dominant role of the AABB in blood-banking and the extent of its control over its institutional members" established the requisite relationship between the AABB and blood-product recipients, "whose safety is its avowed paramount concern." *Id.* at 43, 659 *A.*2d 482. Considering the risk involved and the "public policy concerns implicit in the blood-banking industry's methods of operation," the court determined that the "AABB is reasonably chargeable with a duty of care owed to those recipients whose life and health depend on the reasonableness and prudence of its actions." *Id.* at 43–44, 659 *A.*2d 482.

On the charitable-immunity issue, the court reasoned that "although [the AABB] is a non-profit corporation engaged in necessary and useful services, [it] is not 'organized exclusively for religious, charitable, educational, or hospital purposes.'" *Id.* at 41, 659 *A.*2d 482 (quoting *N.J.S.A.* 2A:53–7). Accordingly, the court denied the AABB's claim of charitable immunity.

## II

### A

Crucial to the assessment of the AABB's alleged duty of care is its role in the blood-banking industry in 1983–84. The blood-banking industry consists of a voluntary sector, which depends on voluntary donors, and a commercial sector, which depends on paid donors. Generally speaking, the voluntary sector provides whole blood and blood components, and the commercial sector provides plasma and plasma derivatives.

Central to the voluntary sector is the American Red Cross with its blood banks, community and hospital blood centers, and the

AABB, which includes almost every blood bank in the United States. These voluntary blood banks rely on public-spirited donors for their blood supply. Voluntary blood banks commonly separate donated blood into three components: plasma, platelets, and red cells.

Dominating the commercial sector are manufacturers or fractionators of plasma derivatives. In the early 1980s, fractionators collected approximately eighty percent of plasma from paid donors. The voluntary sector provided the remaining twenty percent. Fractionators pool plasma from thousands of donors and process it to produce large batches of plasma derivatives, such as clotting factors for hemophiliacs. Each batch contains enough clotting factor to treat thousands of patients. Institute of Medicine, *HIV and the Blood Supply: An Analysis of Crisis Decisionmaking* 15 (1995) (the IOM Report).

State and federal regulations apply to both sectors of the blood-banking industry. The Food and Drug Administration (FDA), an agency of the Public Health Service (PHS) in the United States Department of Health and Human Services (DHHS), inspects and licenses blood banks and other blood facilities. *See* 21 *U.S.C.A.* § 321(g)(1)(B) (broadly defining "drugs" to include "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease," which includes blood and blood products); 21 *U.S.C.A.* § 360(b) (requiring processing establishments, including blood banks, to register with the FDA); 42 *U.S.C.A.* § 262(c) to (d) (requiring inspection and licensing by the FDA (as delegated by secretary of DHHS) of blood or blood-product facilities that participate in interstate commerce); 21 *C.F.R.* § 5.10(a)(1), (5) (1995) (delegating to FDA authority vested in the secretary, DHHS, and PHS in the Food, Drug and Cosmetic Act (21 *U.S.C.A.* §§ 301–95) and in 42 *U.S.C.A.* §§ 262–63); 21 *C.F.R.* § 607.3(b) (1995) (defining blood as a drug). In New Jersey, the Department of Health (DOH) discharges similar responsibilities. *See N.J.S.A.* 26:2A–1 (authorizing DOH to regulate collection, processing and distribution of blood). A blood bank in New

Jersey cannot operate without licenses from both the FDA and DOH. 42 *U.S.C.A* § 262(a); *N.J.S.A.* 26:2A–4.

Against this background, we consider the role of the AABB. According to the AABB's certificate of incorporation, the purpose of the AABB is

> to foster the exchange of ideas and information relating to blood banks and blood transfusion services[;] ... to advance and incorporate high standards of performance and service by blood banks[;] ... to function as a clearing house for the exchange of blood and blood credits ... [and] to encourage the development of blood banks through education, public information and research.

The AABB describes itself as a "professional, non-profit, scientific and administrative association for individuals and institutions engaged in the many facets of blood and tissue banking, and transfusion and transplantation medicine." It is "the only organization devoted exclusively to blood banking and blood transfusion services." In the early 1980s, the AABB centers collected about half of the nation's blood supply and transfused eighty percent of the blood to patients. Its institutional members were mainly hospitals and non-profit blood centers.

According to the AABB's executive director, Joel Solomon, the general purpose of the AABB is "to develop and recommend standards on the practice of blood banking, to help promote the public health, ... and to conduct numerous programs for communication and education among organization members and the public at-large." The AABB discharges its educational mission by conducting workshops and seminars, and by publishing books, newsletters, pamphlets, and a peer-review journal, *Transfusion*. Additionally, the AABB lobbies the United States Congress and state legislatures and participates in federal and state administrative rulemaking procedures.

Significantly, the AABB annually inspects and accredits member institutions. It conditions accreditation on compliance with standards published in its *Standards for Blood Banks and Transfusion Services* and procedures outlined in its *Technical Manual.* According to the annual report, AABB standards often become FDA standards. As the AABB has declared, it "leads the indus-

try in setting policy and establishing standards of practice for its member blood banks in excess of the FDA."

Both the state and federal government, as well as the blood-banking industry, generally accept AABB standards as authoritative. Consequently, blood banks throughout the nation rely on those standards. For example, BCBC relied on the AABB standards in developing its own operating procedures. In the words of Anthony Passaro, Executive Director of BCBC, the AABB's standards in 1984 "were basically the Bible of the blood center."

AABB's inspections complement the annual inspection by the FDA. If a blood bank loses its AABB accreditation but retains its FDA and New Jersey licenses, it can continue to operate, but only with significant practical problems. Hospitals and other blood banks prefer to work with AABB-accredited institutions.

The AABB also issues advisory recommendations and guidelines. The BCBC, which had only a part-time medical director, relied on the AABB for guidance in assuring the safety of its blood supply. According to Dr. Wilkinson, the BCBC's medical director, and Anthony Passaro, its executive director, the BCBC in 1984 followed the AABB's recommendations on AIDS screening. Furthermore, the BCBC would have followed any other AABB recommendations. Dr. Wilkinson testified:

Q: If the A.A.B.B. had recommended that you use a laboratory test for screening aids, would you have done so?

A: Yes.

To the same effect, Mr. Passaro testified:

Q. Mr. Passaro[,] [i]f the American Association of Blood Banks had recommended that you—not you personally—that the Bergen County Community Blood Center do a certain laboratory test for screening donors, would it have been done at the Blood Center?

A. Yes.

In the early 1980s, the AABB led the blood industry. Dr. George F. Grady, an expert in blood-banking procedures and transfusion-related viruses, testified that the AABB had established itself as the leader in setting blood-banking standards. The AABB, moreover, was an active member of the FDA's influential

Blood Products Advisory Council and advised the FDA on issues concerning the blood industry. In a recent study of the FDA's response to the threat of AIDS, the Committee to Study HIV Transmission Through Blood and Blood Products (the Committee) of the Institute of Medicine found that "in the early 1980s, the FDA appeared too reliant upon analyses provided by industry-based members of the Blood Products Advisory Council." IOM Report, *supra*, at 15.

Others also noted governmental deference to the AABB. Dr. Edgar Engleman, the director of the Stanford Blood Bank, testified that in 1984 the FDA took a passive role in developing standards and guidelines, essentially deferring to the AABB in determining the blood-banking industry's response to AIDS. Dr. Thomas Asher, a microbiologist and blood expert who runs a blood-products company, testified that "most state ... governments incorporate into their state regulations the AABB standards, [which] are, in most cases, the state standards for licensing."

At the state level, the DOH, when renewing blood-bank licenses, accepted reports of AABB inspections in lieu of its own inspections. *N.J.A.C.* 8:8–1.4(b) (May 21, 1984). DOH also accepted AABB's standards for obtaining medical histories and conducting physical examinations of donors. *N.J.A.C.* 8:8–5.2 (May 21, 1984).

Finally, in a December 1983 memorandum on potential blood-bank liability from transfusion-related AIDS, the AABB's general counsel advised AABB members that "courts have frequently cited AABB's standards as evidence of appropriate practice, and we believe that the courts will give credence to the recommendations made jointly by AABB and other blood banking organizations."

The picture that emerges is of a private, tax-exempt organization with substantial power over the operation of blood banks, including BCBC. That the blood banks would accept direction from the AABB is understandable: it was their organization. We turn next to the AABB's exercise of that power during the early years of the AIDS crisis.

B

The first report of severe immune deficiency among homosexuals surfaced in 1981. In 1985, the DHHS approved the ELISA test. Snyder received his transfusion in 1984. Our initial inquiry is whether the BCBC should have known in 1984 that blood and blood products could carry the HIV virus. Answering that question requires consideration of the information available to the AABB about the nature, cause, and transmission of AIDS. It also involves consideration of the roles of the AABB and of the Centers for Disease Control (CDC), a public-health branch of DHHS, in investigating and warning of diseases, such as AIDS.

The CDC first sounded the alarm about AIDS. In 1981, in response to a rapidly spreading and often fatal immunological disorder among homosexual males, the CDC formed a group, subsequently known as the AIDS Task Force. The Task Force consisted of epidemiologists knowledgeable about hemophilia, hepatitis, and sexually-transmitted diseases. From 1982 to 1984, the Task Force played a pivotal role in publicizing the threat of AIDS to the nation's blood supply.

The CDC's primary means of alerting the medical and public-health communities of new diseases is through the publication of the *Morbidity and Mortality Weekly Report* (MMWR). Between June 1981 and July 1982, the CDC reported in the MMWR a rapidly increasing number of cases, totaling 355, of previously rare immunosuppression-related ailments among homosexual men and intravenous drug users in New York, California, New Jersey, and Florida. The disease, now known as AIDS, had an extremely high mortality rate: forty percent of its victims had died. Data indicated, moreover, that the longer a patient suffered from the disease, the higher the mortality rate climbed. Initially, AIDS occurred only in gay men. By June 1982, however, other groups were at risk. Seventy-five percent of AIDS patients were gay men, twenty percent were intravenous (IV) drug users, and five percent were not readily classifiable.

The AIDS Task Force began to compile a composite description of the disease. Health officials had learned that AIDS victims exhibited persistently swollen lymph nodes long before the onset of other symptoms. One common symptom was depressed T-lymphocyte helper-to-suppressor ratios, an immunological abnormality that reflects a reduced count of a certain lymphocyte, or white blood cell. Another symptom was a low absolute lymphocyte count, which indicates suppression of the immune system.

The two most prominent AIDS-associated diseases were pneumocystis pneumonia and Kaposi's sarcoma. Before their occurrence in AIDS patients, both pneumocystis pneumonia and Kaposi's sarcoma had been extremely rare. Pneumocystis pneumonia is a type of pneumonia that previously had occurred only in severely immunosuppressed patients, such as those undergoing cancer chemotherapy. Kaposi's sarcoma is a skin malignancy that previously had appeared almost exclusively in elderly men. Other AIDS-related ailments included a form of lymphatic cancer known as non-Hodgkins lymphoma and tuberculosis.

Not all patients suffered from the same diseases. Some had pneumocystis pneumonia; others, Kaposi's sarcoma; and still others suffered from both. Almost all, however, displayed the T-cell ratio abnormality and depressed lymphocyte counts. The clustering of the symptoms among homosexual men and IV drug users and the shared abnormality in white blood cell counts led the CDC to conclude in 1982 that the evidence pointed to a single disease with a common underlying factor.

Plaintiffs presented several expert witnesses who explained the evolution of the discovery that blood and blood products could carry the AIDS virus. Dr. Donald Francis, a virologist and epidemiologist, served as director of the AIDS Task Force laboratory in the early 1980s and as assistant director of the CDC's hepatitis-B effort in the 1970s. He testified that in 1982 the CDC detected a pattern in the transmission of AIDS and in the identification of the persons at risk. The pattern revealed that early homosexual AIDS patients were infecting others through

sexual contact. Also apparent was an incubation period varying from several months to several years. The CDC postulated in June 1982 that the cause of the disease was an infectious agent, such as a virus.

According to Dr. Francis, the epidemiology of AIDS, which affected primarily homosexuals and IV drug users, bore a remarkable resemblance to that of hepatitis B. Hepatitis B is a liver disease that is transmitted perinatally (from a mother to her fetus) or by either sexual contact or blood. In an outbreak of hepatitis B in the 1970s, the major high-risk populations were homosexual men, IV drug users, and hemophiliacs. Because it could be transmitted by blood, transfusion-related hepatitis B had become a serious public-health concern, particularly to the blood-banking industry.

Dr. Ernest Simon, an expert in blood-banking and transfusion medicine, as well as the deputy director of the FDA's blood division from 1976 to 1980, also testified. He stated that during the early 1980s, "[s]even to ten percent of individuals who were transfused ... would [subsequently] show evidence of liver dysfunction probably related to transmissibility of viral hepatitis." Members of the AIDS Task Force, noting the epidemiological similarity between AIDS and hepatitis B, feared that blood and blood products could carry AIDS.

On July 16, 1982, after three hemophiliacs had developed AIDS, the CDC published a landmark report. According to Dr. Francis, the report "brought much of our speculation about the disease to ... a conclusion about its transmissibility." The three hemophiliacs, unlike the average AIDS patient, were heterosexual men who did not use IV drugs. Furthermore, they did not fit within the observed New York–California geographic distribution of AIDS patients. They shared, however, one potential risk: all three treated their hemophilia with the blood product known as Factor VIII, a concentrated clotting factor. The CDC focused on that factor.

In its July 16, 1982, report in the MMWR, the CDC concluded that "[a]lthough the cause of [AIDS] is unknown, the occurrence among the three hemophiliac cases suggests the possible transmission of an agent through blood products." Study of the Factor VIII manufacturing process led CDC researchers to believe that a virus caused AIDS. In producing Factor VIII, fractionators would filter out larger infectious agents, such as bacteria, to reduce the likelihood of contamination. The filters, however, could not trap smaller agents, such as viruses. Dr. Francis explained that the realization that the infectious agent was a virus that could be transmitted by blood "was a red flag and concerned us greatly about the potential for blood-borne transmission of other therapeutic blood products."

On July 27, 1982, the PHS held a national meeting of blood and blood-product collectors to discuss the threat of AIDS. At that meeting, members of the CDC Task Force reported their findings to blood-industry organizations, including the AABB.

In September 1982, Dr. Edward N. Brandt, Jr., the assistant secretary for health at DHHS, issued a directive incorporating the conclusions of the July meeting. In that directive, Dr. Brandt stated that

the recent occurrence of [pneumocystis pneumonia] in three patients with hemophilia raises the question whether the underlying immunodeficiency seen in these patients has the same etiology as among other groups with [pneumocystis pneumonia]. There is need to determine if certain blood products, particularly Factor VIII, are risk factors for AIDS.

Dr. Brandt instructed PHS agencies, including CDC, FDA, and the National Institutes of Health (NIH), to increase their efforts to combat AIDS and to focus on the threat to hemophiliacs from the use of factor concentrate.

In November 1982, the CDC became concerned about the special risk that AIDS posed to doctors, nurses, and other hospital personnel who were exposed regularly to blood. Consequently, the CDC alerted them that "hepatitis-B virus infections occur very frequently among AIDS cases." The CDC warned that "[a]t present, it appears prudent for hospital personnel to use the same

precautions when caring for" AIDS patients as when caring for patients with hepatitis B.

Throughout 1982, evidence continued to accumulate that a blood-borne agent caused AIDS. The CDC reported that, as with the spread of the hepatitis virus among gay men, the AIDS virus was transmitted sexually and by blood. Vaccination specialists from the CDC, the FDA, and the NIH noted that the "epidemiology of AIDS suggests an unidentified and uncharacterized blood-borne agent as a possible cause of the underlying immunologic defect." Moreover, the total number of AIDS cases was doubling every six months. By December, the number of hemophiliacs diagnosed with AIDS likewise had doubled.

Thus, by late 1982, the pattern for AIDS transmission was clear. Dr. Francis testified that some suspected but unconfirmed cases of transfusion-associated AIDS had surfaced in October and November 1982. On December 10, 1982, the CDC reported that an infant who at birth in March 1981 had received a number of transfusions later developed AIDS-like symptoms. The infant's parents did not belong to any known risk group. A donor of one of the units later developed AIDS. The CDC noted that "several features of the infant's illness resemble those seen among adults with AIDS." It explained:

> The etiology of AIDS remains unknown, but its reported occurrence among homosexual men, intravenous drug abusers, and persons with hemophilia A suggests it may be caused by an infectious agent transmitted sexually or through exposure to blood or blood products. If the infant's illness described in this report is AIDS, its occurrence following receipt of blood products from a known AIDS case adds support to the infectious-agent hypothesis.

> \*   \*   \*   \*   \*   \*   \*   \*

> If the platelet transfusion contained an etiologic agent for AIDS, one must assume that the agent can be present in the blood of a donor before onset of symptomatic illness and that the incubation period for such illness can be relatively long.

Because of the long incubation period for AIDS, the Task Force feared that the undiscovered cases greatly exceeded those that had been reported.

One week later, the CDC reported four cases of AIDS in infants under the age of two whose mothers belonged to high-risk populations, but who had not received any blood transfusions. In an additional twelve suspected cases of infant AIDS, nine of the mothers were IV drug users. The CDC reported that the children could have been infected by the "[t]ransmission of an 'AIDS agent' from mother to child, either in utero or shortly after birth." That possibility, according to Dr. Francis, "really fill[ed] in all of the pieces of the puzzle of transmission here.... The epidemiology of HIV now looked identical to hepatitis B virus."

Members of the CDC AIDS Task Force developed a model of the cause and transmission of AIDS. Dr. Francis explained:

[W]e're talking about an infectious, viral agent, that was in the blood of individuals, that had the same epidemiologic pattern of sexual, blood-borne and perinatal ... transmission that hepatitis B virus had, that destroyed a specific lymphocyte, specific [white blood] cell in the immune system....

The person that would be likely to have this virus ... would be gay men and intravenous drug users or their sexual contacts.

## C

Alarmed at the prospect of AIDS in the blood supply, the CDC called an emergency workshop in Atlanta for January 4, 1983. The purpose of the meeting was to ascertain how to prevent the transmission of AIDS through blood and blood products. Representatives of government, the AABB, the American Red Cross, the Council for Community Blood Banks, the National Hemophilia Foundation, the National Gay Task Force, and other organizations attended the meeting. The AIDS Task Force was convinced that AIDS was blood-transmissible, and that its epidemiology mirrored that of hepatitis B, "involving the same high-risk groups and in the same proportions."

The Task Force also presented disturbing information about the risk of the transmission of AIDS in the blood supply. By that time, the CDC had reported six cases of transfusion-associated AIDS. A study of 140 gay men with AIDS in San Francisco revealed that at least ten had admitted donating blood in previous

years. Because the specific causative agent for AIDS had not yet been identified, the Task Force asserted that persons at high risk for AIDS should not donate blood.

The Task Force recommended three methods to screen out high-risk donors: (1) direct questioning of prospective donors to determine if they belonged to high-risk groups; (2) detailed recording of medical histories of prospective donors to determine any indications of early AIDS symptoms; and (3) institution of surrogate testing of collected blood. Together, these three methods would have prevented blood from high-risk donors from entering the blood supply. Specifically, surrogate testing would have complemented the other two methods by providing an objective test of blood from high-risk donors who were symptom-free and reluctant to admit to homosexual activity or IV drug use.

Consistent with that recommendation, the Task Force proposed three surrogate tests: (1) the hepatitis-B core-antibody test (core test), which tested for people who either had been or are infected with hepatitis B; (2) the T-cell ratio test, which tested for the specific immunological abnormality common in AIDS patients; and (3) the absolute-lymphocyte test, which tested for a reduced level of lymphocytes.

In 1982, Dr. Thomas Spira of the CDC Task Force conducted a study of the effectiveness of various surrogate tests. He concluded that the core test would identify a large majority of people with or at risk of contracting AIDS. Of patients with AIDS, the core test revealed that eighty-eight percent of gay men, one-hundred percent of IV drug users, and eighty-seven percent of Haitians tested positive for the hepatitis-B core antibody. Seventy-nine percent of the control group of homosexual and bisexual men not suffering from AIDS—the most significant high-risk group—tested positive for hepatitis B. This result was consistent with earlier studies indicating high levels of hepatitis-B infection among gay men. M.T. Schreeder, *et al., Hepatitis B in Homosexual Men: Prevalence of Infection and Factors Related to Transmission,* 146 *J. Infectious Diseases* 8 (July 1982). Because hepatitis B was

uncommon in the general population, the Task Force estimated that five percent of the remaining healthy male population would test positive. On balance, the Task Force concluded that the core test was the most promising.

At the January 4, 1983, meeting, the AABB and other blood-banking representatives strenuously disagreed with the CDC. Dr. Joseph Bove, chairman of the AABB Committee on Transfusion Transmitted Disease, stated that he was unconvinced that blood could transmit AIDS. He argued that surrogate testing was unnecessary and that direct questioning was improper.

Dr. Francis rejoined that the AABB's response was "remarkably obstructive." He recognized the response as "basically an attempt to deny that there was a threat." The AABB nonetheless persisted in arguing that surrogate testing and direct questioning would be too costly and would lead to the rejection of too much blood. Dr. Francis described the meeting:

> [T]he reluctance and the inertia that we at CDC faced with the blood banks in that meeting was so ... ridiculous and so alarming that it got to the point of me literally pounding on the table and shouting to these individuals as to how many deaths it's going to take before you will act.
>
> And I was saying, do you need ten, do you need twenty, do you need forty, when we get to that level, then are you going to act?
>
> This was a very heated meeting because of this incredible counter balance of those of us investigating the epidemic and seeing the urgency of the situation ... to put the responsibility for action onto the blood banks, because presumably, they were the only ones that could act, that there—the imbalance of this urgency from us and the obstruction, the negative response from them was a most disturbing time, one of the most disturbing times in my twenty years in public health.

Following the meeting, the lines hardened. The AABB criticized both direct-donor questioning and surrogate-blood testing. In a joint statement of January 13, 1983, the AABB, the American Red Cross, and the Council of Community Blood Banks described the CDC data as "insufficient," the evidence "inconclusive," and the possibility that blood transmitted AIDS as "still unproven." Still, as the CDC Task Force had urged, they recommended that their members take from donors detailed medical histories emphasizing early AIDS symptoms. The joint statement continued,

however, that the AABB and the others "[did] not advise routine implementation of any laboratory screening program for AIDS by blood banks at this time," even though "there are laboratory and clinical findings that are present in nearly all AIDS patients." Finally, the AABB and the other organizations rejected direct questioning of donors about sexual preference as ineffective and as an unjustifiable "invasion of privacy." Confronted with escalating evidence that blood transmitted the AIDS virus and that surrogate testing would reveal the presence of the virus, the AABB became increasingly intransigent.

Throughout 1983, the evidence continued to mount. On March 4, 1983, the PHS reported in MMWR that "the occurrence of AIDS among IV drug users" supports a finding that "blood products or blood appear responsible for AIDS among hemophilia patients." The PHS recognized the need for, but did not recommend, surrogate testing.

A month later, the AABB issued a set of standard operating procedures that required only the distribution of AIDS educational material to donors and continued medical history screening. The AABB refused to require surrogate testing or direct questioning of donors.

That refusal, like Dr. Bove's testimony at the January 4, 1983, CDC meeting, belied internal concerns within the AABB. In December 1982, Dr. Bove wrote an internal memo indicating a growing concern that AIDS could cause "major problems in the blood collecting sector." He continued that his "current best guess is that we are dealing with an infectious agent able to be spread by blood and blood products and that individuals who receive large quantities of factor concentrate are at an increased risk." In a January 1983 report, Dr. Bove noted that a recently discovered transfusion-related AIDS case "increases the probability that AIDS may be spread by blood." He recognized that "there is little doubt in my mind that additional transfusion related cases and additional cases in patients with hemophilia will

surface," and that the CDC was actively pursuing more transfusion-related cases. Consequently, Dr. Bove advised that

the most we can do in this situation is buy time ... [before the AABB] will be obliged to review our current stance and probably move in the same direction as the commercial fractionators. By that I mean it will be essential for us to take some active steps to screen out donor populations who are at high risk of AIDS.

Additionally, Dr. Bove expressed concern that "we do not want anything that we do now to be interpreted by society (or by legal authorities) as agreeing with the concept—as yet unproven—that AIDS can be spread by blood." Dr. Bove stressed that the AABB must do "whatever is medically correct," but that "we may have to do a little more, since we are accused of burying our heads in the sand." Notwithstanding these qualifications, Dr. Bove recognized that blood carries the AIDS virus and that the AABB should actively screen high-risk donors.

In a report dated March 29, 1983, Dr. Bove noted increasing pressure from the federal government and the CDC. He predicted that the "next step on the horizon will probably be a request to institute a mandatory screening of donor blood." Somewhat ambivalently, Dr. Bove stated, however, "that the evidence linking AIDS to blood transfusion is unconvincing." For whatever reason, he and the AABB could not accept the fact that blood can transmit the AIDS virus. Yet, in October 1983, in a memo to the AABB Board of Directors, Dr. Bove warned the AABB board of directors that a forthcoming article by Dr. James W. Curran and others in the prestigious *New England Journal of Medicine* documented eighteen cases of transfusion-related AIDS.

The plasma industry, which relies on paid donors, took a much more cautious view. Whenever a plasma donor later developed AIDS, the industry would withdraw all coagulation products made from that donor's blood.

Consistent with that approach, the FDA, in a March 24, 1983, memorandum to licensed manufacturers of plasma derivatives, prohibited use of plasma "collected from donors suspected of being at increased risk of transmitting AIDS" from being used to produce "derivatives already known to have a risk of transmitting

infectious diseases," such as the clotting factors used in treating hemophilia. Thus, the memorandum evidences the decision of the federal government to exclude high-risk donors, specifically sexually-active homosexuals. Existing regulations already excluded IV drug users. In sum, the FDA's recommendation reflected its growing concern about AIDS contamination of blood and blood products.

Beginning in 1983, some blood banks began to institute surrogate testing. In January 1983, Dr. Thomas Asher began testing all blood for total lymphocyte count at his commercial blood-fractionating facility. Seven months later, the Stanford University Hospital blood bank instituted the T-cell ratio test. Several northern California blood banks instituted the core test in 1984. No AIDS cases resulted from blood tested at any of these facilities. At a December 1983 meeting of the FDA's Blood Products Advisory Committee, Dr. Edgar Engleman, director of the Stanford blood bank, reported that the bank had rejected, on the basis of T-cell test results, two high-risk donors who should have self-excluded after reading the AIDS information materials, but who elected to donate anyway.

Two influential reports published in early 1984 addressed transfusion-associated AIDS. Dr. Curran's article in the January 12, 1984, *New England Journal of Medicine*—the article about which Dr. Bove had alerted the AABB board of directors in October 1983—concluded that AIDS could be transmitted through blood and blood products. James W. Curran, *et al., Acquired Immunodeficiency Syndrome (AIDS) Associated with Transfusions,* 310 *New England Journal of Medicine* 69, 73–74 (Jan. 12, 1984); *see Kozup v. Georgetown Univ.,* 663 *F.Supp.* 1048, 1052 (D.D.C.1987) (describing the article as the definitive statement that AIDS was caused by blood-borne agent).

A subsequent article in the *Annals of Internal Medicine,* another respected peer-review journal, quantified the risks associated with blood transfusion and treatment of hemophilia. The article stated:

Present evidence increasingly indicates that the syndrome is caused by an agent that may be transmitted through transfusions, but risk to a person receiving blood is very small. During 1983, 28 cases of transfusion-associated syndrome were diagnosed ... in the United States. Each year, more than 3 million persons receive transfusions in the United States: thus for 1983, the crude annual rate of reported cases of the syndrome approximates 1 case per 100,000 recipients.

[James W. Curran and Llewelyn F. Barker, *The Acquired Immunodeficiency Syndrome Associated with Transfusions: The Evolving Perspective,* 100 *Annals of Internal Medicine* 298, 299 (Feb. 1984)].

The statistics for hemophiliacs were far more severe:

The 12 cases of [AIDS] diagnosed in 1983 among persons with hemophilia represent an annual rate of 1 case per 1000 hemophiliacs receiving antihemophilic concentrates. The relatively high rate among hemophiliacs may result from the method of concentrate production: each hemophiliac is exposed annually to several concentrate lots, each containing plasma pooled from thousands of donors.

*[Ibid.]*

On April 13, 1984, at a telephone conference of the FDA's Blood Products Advisory Committee, the FDA announced the following position:

The recent decision by several blood and plasma organizations to use the anti-core test was a voluntary decision on their part with the recognition of the limitations of the test and the lack of data to support the premise that excluding anti-core positive individuals from donor pools will have any impact on the frequency with which donors are later found to have developed AIDS.

At this point, it would seem reasonable to continue voluntary and cooperative efforts aimed at assessing the potential usefulness of a variety of laboratory tests for their predictive value in identifying individuals who are in a pre-clinical stage of AIDS. On the basis of the information available to date, it is possible that screening tests other than anti-core may ultimately prove to be more predictive and generally useful in improving the safety of blood and blood products. It would therefore be unwise to adopt anti-core testing to the exclusion of other screening tests.

In July 1984, the Blood Products Advisory Committee's Hepatitis B Core Antibody Testing Study Group (study group) reported its findings on the core test. The study group consisted of eleven members representing the FDA, plasma fractionators, and major blood-industry associations, including the AABB. The majority of the study group, including the AABB, rejected the core test. It contended that the core test would lead to the rejection of too many healthy donors, was not sufficiently specific, and cost too much. Further, the majority contended that self-screening was working. A minority recommended adoption of the core test. It

asserted that self-screening was not working and urged that the core test would exclude sixty to eighty percent of high-risk donors. As a matter of policy, the minority concluded that concerns about blood safety outweighed concerns about a diminishing blood supply or excessive costs.

On April 24, 1984, Secretary Margaret Heckler of the DHHS announced that researchers had isolated the AIDS virus and had developed a blood test for AIDS. She believed that the test, now known as the ELISA test, would be available within six months. In fact, the DHHS approved the ELISA test on March 4, 1985, seven months after Snyder received his transfusion.

### III

■ Against that background, we consider whether the AABB owed Snyder a duty of care. Our analysis begins by recognizing that the AABB did not directly obtain, process, or transfuse the infected platelets that caused Snyder to contract AIDS. Thus, the AABB had no immediate connection with either the donor or with Snyder.

■ The determination of the existence of a duty ultimately is a question of fairness and policy. *Crawn v. Campo,* 136 *N.J.* 494, 501, 643 *A.*2d 600 (1994); *Dunphy v. Gregor,* 136 *N.J.* 99, 108, 642 *A.*2d 372 (1994); *Kelly v. Gwinnell,* 96 *N.J.* 538, 544, 476 *A.*2d 1219 (1984); *Goldberg v. Housing Auth.,* 38 *N.J.* 578, 583, 186 *A.*2d 291 (1962). An important, although not dispositive consideration, is the foreseeability of injury to others from the defendant's conduct. *Carter Lincoln–Mercury v. EMAR Group,* 135 *N.J.* 182, 194, 638 *A.*2d 1288 (1994). Also important are the nature of the risk posed by the defendant's conduct, the relationship of the parties, and the impact on the public of the imposition of a duty of care. *Dunphy, supra,* 136 *N.J.* at 108, 642 *A.*2d 372. The absence of a contractual or special relationship is not dispositive. *Carter Lincoln–Mercury, supra,* 135 *N.J.* at .195–97, 638 *A.*2d 1288; *see also Aronsohn v. Mandara,* 98 *N.J.* 92, 105, 484 *A.*2d 675 (1984) (holding that lack of privity of contract between build-

ing contractor and third persons does not bar recovery for those injured by defendant's negligence); *H. Rosenblum, Inc. v. Adler*, 93 *N.J.* 324, 338–39, 461 *A*.2d 138 (1983) (holding that reasonably foreseeable consequences of auditor's negligent opinion about corporation's finances, not privity in contract, define duty owed to persons foreseeably relying on auditor's representations).

Blood banks, hospitals, and patients rely on the AABB for the safety of the nation's blood supply. A patient contemplating surgery cannot assure the safety of blood drawn from others. Of necessity, patients rely on others, including the AABB, for that assurance.

Society has not thrust on the AABB its responsibility for the safety of blood and blood products. The AABB has sought and cultivated that responsibility. For years, it has dominated the establishment of standards for the blood-banking industry. To illustrate, the AABB's January 1983 joint statement with the Red Cross and Council of Community Blood Centers endorsed the AABB-recommended screening measures as "prudent and appropriate." In a March 31, 1983, AABB press release, Dr. Bove stated:

> We would also like to assure the public that the chance of anyone acquiring AIDS through a blood transfusion is remote.... Every precaution is being taken to assure that each unit of blood transfused is the safest possible.

By words and conduct, the AABB invited blood banks, hospitals, and patients to rely on the AABB's recommended procedures. The AABB set the standards for voluntary blood banks. At all relevant times, it exerted considerable influence over the practices and procedures over its member banks, including BCBC. On behalf of itself and its member banks, the AABB lobbies legislatures, participates in administrative proceedings, and works with governmental health agencies in setting blood-banking policy. In many respects, the AABB wrote the rules and set the standards for voluntary blood banks.

We next examine the severity and foreseeability of the risk that blood transfusions could spread the AIDS virus. The severity of

the risk of transfusion-related AIDS is a function of the mortality rate and the infection rate. In 1984, the overall mortality rate of AIDS was forty percent, but for those who had AIDS for more than three years, the rate approached nearly 100 per cent. The infection rate was increasing exponentially. For example, the CDC reported thirty-eight cases of transfusion-related AIDS by December 1983, up from six cases reported in January of that year. The CDC believed that as more people became infected with AIDS, the risk to the blood supply also would increase. Thus, the risk that blood transfusions could transmit AIDS was severe.

The risk also was foreseeable. Epidemiologists at the CDC believed as early as 1982 that the AIDS virus could be transmitted by blood and blood products. In January 1984, Dr. Curran's article in the *New England Journal of Medicine* confirmed that belief. Thus, before Snyder received his transfusion, the AABB should have foreseen that a blood transfusion could transmit AIDS.

We are unpersuaded by the AABB's argument that because the evidence was inconclusive, it owed no duty to Snyder. The foreseeability, not the conclusiveness, of harm suffices to give rise to a duty of care. By 1983, ample evidence supported the conclusion that blood transmitted the AIDS virus. In early 1984, the AABB knew that AIDS was a rapidly spreading, fatal disease and that apparently healthy donors could infect others. The AABB also knew that blood and blood products probably could transmit AIDS and that each infected blood donor could infect many donees. Thus, the AABB knew, or should have known, in 1984 that the risk of AIDS infection from blood transfusions was devastating. We agree with the lower courts that the record establishes that the AABB owed Snyder a duty of care.

The AABB claims that considerations of public policy and fairness negate the imposition of a duty of care extending to Snyder. Specifically, the AABB contends that it should not be found liable for taking the "wrong side" of a debate involving medical uncertainties and public policy. According to the AABB,

the imposition of liability violates its constitutionally-protected right to participate in the political process. The argument misses the mark.

The AABB relies on the *Noerr–Pennington* doctrine, which states generally that because of First Amendment considerations, commercial interests that lobby to influence government do not violate antitrust laws. *California Motor Transp. Co. v. Trucking Unlimited,* 404 *U.S.* 508, 510–11, 92 *S.Ct.* 609, 611–12, 30 *L.Ed.2d* 642 (1972); *United Mine Workers v. Pennington,* 381 *U.S.* 657, 669–70, 85 *S.Ct.* 1585, 1593, 14 *L.Ed.2d* 626 (1965); *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 *U.S.* 127, 135–38, 81 *S.Ct.* 523, 529–30, 5 *L.Ed.2d* 464 (1961); *see generally* 4 Ronald E. Rotunda and John E. Nowak, *Treatise on Constitutional Law: Substance and Procedure 2d* 520.54 (1992). The United States Supreme Court has not extended the doctrine beyond the field of antitrust. Lower federal courts, however, have applied the *Noerr–Pennington* doctrine to other areas of the law, including tort liability. *See, e.g., South Dakota v. Kansas City S. Indus., Inc.,* 880 *F.*2d 40, 50–51 (8th Cir.1989) (finding that defendant's litigation activities were protected under *Noerr–Pennington* doctrine against liability for tortious interference with contract); *Brownsville Golden Age Nursing Home, Inc. v. Wells,* 839 *F.*2d 155, 160 (3d Cir.1988) (holding that "as a matter of law, [the individuals'] actions in calling [the nursing home's] violations to the attention of state and federal authorities and eliciting public interest cannot serve as the basis of tort liability"); *Havoco of America, Ltd. v. Hollobow,* 702 *F.*2d 643, 648–51 (7th Cir.1983) (holding that *Noerr–Pennington* doctrine immunized defendant against liability for tortious interference based on right to complain to Securities and Exchange Commission); *First Nat'l Bank of Omaha v. Marquette Nat'l Bank,* 482 *F.Supp.* 514, 521 (D.Minn. 1979) (holding that *Noerr–Pennington* immunity applicable to plaintiff's antitrust claim also applies to 42 *U.S.C.A.* § 1983 claim); *Village Supermarket v. Mayfair,* 269 *N.J.Super.* 224, 230–31, 634 *A.*2d 1381 (Law Div.1993) (holding that participation in planning board hearings is afforded First Amendment protection against

state tort claims under *Noerr–Pennington* doctrine). *But see* Robert A. Zauzmer, Note, *The Misapplication of the Noerr– Pennington Doctrine in Non–Antitrust Right to Petition Cases,* 36 *Stan. L.Rev.* 1243, 1262–71 (1984) (arguing against application of *Noerr–Pennington* doctrine beyond antitrust area).

We need not determine whether the *Noerr–Pennington* doctrine extends beyond antitrust law to tort liability. The AABB's liability does not rest on its right to petition government. The jury found that the AABB was negligent for failing to recommend that its member banks adopt surrogate testing, and not for the AABB's lobbying efforts or its participation on the FDA Blood Products Advisory Board. In brief, the *Noerr–Pennington* doctrine does not apply.

The AABB also alleges that the imposition of a duty contravenes the public policy of fostering open debate on health issues. It warns that imposition of such a duty would chill debate on public-health issues and impair scientific discourse. According to the AABB, the imposition of a duty of care would engender fear of liability that would result in the adoption of ill-conceived standards. Finally, the AABB contends that it did not accept the core test because of concerns about the effect that such a test would produce on the availability and cost of blood.

These concerns, however, should not have diverted the AABB from its paramount responsibility to protect the safety of the blood supply. Recognition of that responsibility should have led the AABB to consider more carefully the risks to recipients from the transfusion of infected blood. When balanced against the devastating risks from a disease such as AIDS, the imposition of a duty of care on the AABB does not, in our opinion, offend the public policy favoring open debate on controversial scientific issues.

Relevant also to the determination of the AABB's duty of care is its role in the governmental regulation of the blood-banking industry. In 1984, the AABB was more than a trade association. It was the governing body of a significantly self-regulated industry. The AABB, for example, told its member banks how to

screen, obtain, and distribute blood. To assure compliance with its standards, the AABB accredited and inspected its member banks. The clearest example of the AABB's control in 1984 over its member banks emanates from the 1984 DOH regulations of blood banks. Under those regulations, DOH required blood banks to meet both the FDA and AABB standards pertaining to medical histories and physical examinations of donors. *N.J.A.C.* 8:8–5.2 (May 21, 1984). At that time, the AABB standards were more stringent than those of the FDA. Furthermore, the DOH accepted AABB inspection reports in lieu of making its own inspections when renewing blood-bank licenses. *N.J.A.C.* 8:8–1.4(b) (May 21, 1984). Thus, if a blood bank failed the annual AABB inspection on the taking of medical histories, that bank could lose its license to operate in New Jersey. In sum, at least in New Jersey in 1984, the AABB was not a mere advisory body. It exercised control of its member banks, including BCBC.

As the record reflects, moreover, the AABB was a major player in both state and federal government in setting blood policy in the 1980s. The AABB contends that because it had such a significant role in setting public policy, it should not owe a duty of care to a private party. We disagree.

Although the AABB's mission doubtless has altruistic overtones, the bottom line is that the AABB represents its interests and those of its members. At stake for its members was a substantial financial interest in the regulation of the industry. In 1984, voluntary blood banks generated revenues of approximately one billion dollars. As AABB director Gilbert Clark stated, " 'think of us as tax-exempt rather than not-for-profit. We have to make a profit.' " Andrea Rock, *Inside the Billion–Dollar Business of Blood, Money* 153, 158 (March 1986); *see also* Linda M. Dorney, Comment, *Culpable Conduct with Impunity: The Blood Industry and the FDA's Responsibility for the Spread of AIDS Through Blood Products,* 3 *J. Pharm. L.* 129, 132 n. 34 (1994) (reporting that American Red Cross blood program generated average profit of $38 million per year from 1980–87). Blood is big business.

Unlike governmental agencies, the AABB was not created by statute. It does not act pursuant to a government mandate. Nor is it accountable either to the public or another branch of government. No matter how much power the AABB exercised, the inescapable fact is that it is not a governmental agency. Consequently, we need not defer to the AABB's decisions on protection of the blood supply and allocation of industry resources, as we might otherwise defer to agency determinations.

Likewise, we reject the contention of our dissenting colleague, *post* at 317, 676 *A*.2d at 1060, that the AABB enjoyed qualified immunity, remaining liable only for the failure to act in good faith. Relevant to the determination whether a private association is entitled to qualified immunity as a quasi-governmental entity are both the association's activities and its relationship to government. In each case in which a court has recognized a private entity's claim of immunity, the entity had performed quasi-governmental functions pursuant to a governmental grant of authority. *Austin Mun. Sec., Inc. v. National Ass'n of Sec. Dealers, Inc.,* 757 *F*.2d 676 (5th Cir.1985), involved the National Association of Securities Dealers (NASD), a self-regulatory organization formed under the authority of the Maloney Over–the–Counter Market Act of 1938, 15 *U.S.C.A.* § 78o–3, which amended the Securities Exchange Act of 1934, 15 *U.S.C.A.* §§ 78a–78ll. Congress empowered organizations like the NASD "to enforce ... 'compliance by members of the industry with both the legal requirements laid down in the Exchange Act and the ethical standards going beyond those requirements.'" *Austin Mun. Sec., supra,* 757 *F*.2d at 680 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. NASD,* 616 *F*.2d 1363, 1367 (5th Cir.1980)). Because the NASD was performing disciplinary functions pursuant to a congressional mandate, the court accorded it "absolute immunity from civil liability for actions connected with the disciplining of its members." *Id.* at 692. *Kwoun v. Southeast Missouri Professional Standards Review Org.,* 811 *F*.2d 401, 406–07 (8th Cir.1987), involved a medical peer-review group that was under

contract with DHHS to review physicians' activities under Medicare. Because the peer-review group acted under a congressionally-authorized contract to conduct a quasi-prosecutorial review of physicians' activities, the court accorded it absolute immunity from tort claims. *Id.* at 408–09; *see also Citrano v. Allen Correctional Ctr.*, 891 *F.Supp.* 312, 317 (W.D.La.1995) (granting qualified immunity to employees of private corporation operating prison under contract with state). *But see Manis v. Corrections Corp. of America*, 859 *F.Supp.* 302, 304–05 (M.D.Tenn.1994) (finding that private corporation operating prison was not entitled to qualified immunity from suit under 42 *U.S.C.A.* § 1983). Similarly, the mental hospital in *Sherman v. Four County Counseling Ctr.*, 987 *F.*2d 397, 405–06 (7th Cir.1993), which was operating under a court order to admit a patient on an emergency basis, was fulfilling a public function analogous to that of a state hospital. Consequently, the court extended to the hospital qualified immunity from tort liability. *Id.* at 406.

The dissent relies on *Berends v. City of Atlantic City*, 263 *N.J.Super.* 66, 621 *A.*2d 972 (App.Div.1993), to support the contention that the AABB should be immune from the consequences of its negligence because it was performing "a quasi-governmental task that the state would have to perform." *Post* at 314, 676 *A.*2d at 1058. According to the dissent, "it would be anomalous to punish the AABB for its actions since its decisions resulted from its participation in a process on which the government's immunity is founded." *Ibid.* We disagree.

The facts of the *Berends* case, which center on an August 27, 1986, airplane crash at the Atlantic City municipal airport, differ significantly from those in the present case. On May 17, 1986, Atlantic City had closed one of two runways at the airport because of safety concerns. *Berends, supra,* 263 *N.J.Super.* at 70, 621 *A.*2d 972. Pursuant to a contract with the city, Pan Am Management Systems, Inc. (Pan Am) began to operate the airport on June 1, 1986. *Id.* at 73, 621 *A.*2d 972. The accident occurred on the second runway. *Id.* at 69, 621 *A.*2d 972. Plaintiff claimed that

the accident would not have happened if Pan Am had opened the first runway. *Id.* at 71, 621 *A.*2d 972.

In affirming summary judgment for all defendants, the Appellate Division hypothesized in *dicta* that even if "Pan Am had unilateral authority to reopen the runway [it] should not be faulted for deferring to the city's decision to keep the runway closed based on the city's extensive experience in operating [the airport]." *Id.* at 83, 621 *A.*2d 972. Thus, the Appellate Division reasoned that Pan Am could not have been negligent if it had deferred to the city's decision to close the first runway. The court pointed out that Pan Am had "made its decision responsibly in concert with the airport's owner [the city], the [Federal Aviation Administration], the N.J. Division of Aeronautics and the public." *Ibid.*

Pan Am's claim of governmental immunity relates back to the contract with Atlantic City, which had "extensive experience" in operating the airport. Unlike Pan Am, the AABB did not act pursuant to a contract with any governmental agency. Significantly, moreover, the relative roles of Pan Am and the AABB in their respective industries differed. Pan Am operated the airport under strict federal and state regulation. *Id.* at 74, 621 *A.*2d 972. In the blood-banking industry, by comparison, the AABB was more influential and the governmental regulators more lenient. *See supra* at 312–16, 676 *A.*2d at 1058–60. For years, the AABB had induced the industry to rely on the AABB's blood-banking standards and recommendations. Nothing other than its own self-interest and tragically bad judgment prevented the AABB from recommending surrogate testing. Finally, the decision-making process differs substantially in the two cases. Pan Am participated in a multi-agency decision-making process that included public hearings and participation. *Berends, supra,* 263 *N.J.Super.* at 73–75, 621 *A.*2d 972. In contrast, the AABB reached its decision not to recommend surrogate testing internally, in closed sessions. Because of these differences, we conclude that *Berends* is not

helpful in resolving whether the AABB is entitled to governmental immunity.

The dissent cites several cases in which "[c]ourts have granted immunity to private parties for their good-faith performance of quasi-governmental tasks." *Post* at 316, 676 *A*.2d at 1060. Many of the cases on which the dissent relies involve immunity for arbitrators. *Post* at 316, 676 *A*.2d at 1060. Arbitrators derive their immunity from the discharge of quasi-judicial functions pursuant to a federal statute, the Arbitration Act, 9 *U.S.C.A.* §§ 1 to 16. Under the Arbitration Act, Congress intended arbitration as a form of alternative dispute resolution in which the arbitrator takes the place of a judge. *Corey v. New York Stock Exchange*, 691 *F*.2d 1205, 1209 (2d Cir.1982) (stating that "[b]y private agreement the parties have substituted the arbitrators for a judge as the decision-maker in their case"). The New Jersey Arbitration Act embodies a similar policy and intent. *N.J.S.A.* 2A:24–1 to –11; *Barcon Assoc. v. Tri–County Asphalt Corp.*, 86 *N.J.* 179, 186–87, 430 *A*.2d 214 (1981). As the *Corey* court stated, "[t]o allow collateral attack against arbitrators would also emasculate the appeal provisions of the federal Arbitration Act." *Corey, supra,* 691 *F*.2d at 1211.

Admittedly, the AABB's activities in setting industry standards, recommending practices, and conducting inspections seem like those of a governmental agency. Furthermore, both the federal government and New Jersey relied on the AABB's performance of those activities. For example, in 1984, FDA regulations allowed blood banks to rely on AABB standards as long as they were consistent with, and at least as stringent as, FDA regulations. 21 *C.F.R.* § 606.100(d) (1984). As previously indicated, moreover, *supra* at 278, 294, 676 *A*.2d at 1040, 1049, the DOH incorporated into its regulations AABB standards for medical histories and physical examinations of donors. Neither the FDA nor the DOH contracted with the AABB for the regulation of the blood-banking industry. Nor did either governmental agency delegate to the AABB the authority to regulate that industry. Thus, the AABB acted without the benefit of governmental authority.

The dissent urges that we accord the AABB the benefit of qualified immunity without imposing on it the burdens of public office. It contends that "[t]he majority seeks to have it both ways: by finding a duty of care and liability because of the governmental authority delegated to the AABB, but then denying immunity because of a perceived lack of governmental authority." *Post* at 316–319, 676 *A.*2d at 1060–1061. Not so. The contrary is true. By defending the AABB's status as a private organization free from public accountability while conferring on the AABB governmental immunity, the dissent seeks to impute to the AABB power without responsibility. From our perspective, the DOH's reliance on AABB standards and inspections, like the AABB's lobbying efforts and participation in the formulation of public policy, reflect the power of the AABB in the blood-banking industry.

Merely because the AABB sometimes acted like a governmental agency does not mean that it was such an agency or the functional equivalent of one. No law or other governmental directive required the AABB to subordinate its interests to those of the public. Indeed, the record reflects the AABB's unswerving commitment to its interests and those of its members.

Although the AABB may have made a "policy-bound decision," *post* at 318, 676 *A.*2d at 1061, the process that led to that decision differed significantly from that of governmental agencies. Unlike the decisions of such agencies, the AABB's decisions were not subject to public scrutiny. *See* 5 *U.S.C.A.* §§ 551–59, 701–06 (federal Administrative Procedure Act, generally providing for public participation in administrative rulemaking, public access to agency records, and judicial review of federal agency decisions); *N.J.S.A.* 10:4–6 to –21 (the New Jersey Open Public Meetings Act, requiring advance notice of and opportunity for the public to attend meetings of public bodies); *N.J.S.A.* 52:14B–1 to –15 (the New Jersey Administrative Procedure Act, establishing public participation procedures and requirements for rulemaking and contested cases). The internal AABB meetings that yielded the

decision not to recommend surrogate testing were not open to the public. Nor were minutes of those meetings publicly available. Discussions at those meetings extended beyond blood safety and supply to concerns about the need to maintain the appearance of unity among the major blood organizations, the growing public fear of AIDS in the blood supply, the AABB's public image, and its potential liability in tort.

The dissent's attempt to compare the AABB to entities entitled to qualified immunity fails for another reason. Those other entities are subject to the strictures of procedural safeguards or governmental oversight. For example, arbitrators discharge their duties subject to established procedures and judicial review. *Corey, supra,* 691 *F.*2d at 1210. Similarly, the company that contracted with the State of Louisiana to run a prison was subject to contractual and statutory requirements as well as state monitoring and inspection. *Citrano, supra,* 891 *F.Supp.* at 315; *La.Rev.Stat. Ann.* § 39:1800.4. The NASD likewise functions subject to the supervision of the Securities and Exchange Commission and within the system of self-regulation established by Congress. *Austin Mun. Sec., supra,* 757 *F.*2d at 680. Finally, court-appointed bankruptcy trustees and corporate directors perform their statutorily-defined tasks subject to the court's scrutiny. *Weissman v. Hassett,* 47 *B.R.* 462, 466–67 (S.D.N.Y.1985) (reviewing bankruptcy trustee's duties under 11 *U.S.C.A.* § 1106); *Latt v. Superior Ct.,* 212 *Cal.Rptr.* 380, 384 (Ct.App.1985) (discussing role of court-appointed director acting pursuant to *Cal. Corp. Code* § 308), *review granted,* 215 *Cal.Rptr.* 851, 701 *P.*2d 1169 (1985), *review vacated,* 223 *Cal.Rptr.* 266, 713 *P.*2d 1196 (1986). Contrary to the dissent, the AABB remained a private organization that operated free from procedural safeguards and governmental oversight.

Yet another reason counsels against the dissent's suggested remand "to the Law Division for a new trial to consider whether AABB acted in bad faith or with malice in refusing to implement the surrogate test." *Post* at 323, 676 *A.*2d at 1063. At no time has the AABB asked for such a remand. The AABB has never

argued that it is entitled to qualified immunity from liability if it acted in good faith. That argument surfaced for the first time in the brief of *amicus curiae* American Society of Association Executives. A remand for a retrial under a standard that the AABB never urged would be an injustice to a plaintiff with so tenuous a hold on life.

■ Similarly, we reject the argument of the American Society of Association Executives that the AABB is immune from tort liability under the New Jersey Tort Claims Act as a "public entity." *N.J.S.A.* 59:1–1 to 12–3. The Act declares that "a public entity is not liable for an injury, whether such injury aries out of an act or omission of the public entity...." *N.J.S.A.* 59:2–1. "Public entity" is defined to "include[ ] the State, and any county, municipality, district, public authority, public agency, and any other political subdivision or public body in the State." *N.J.S.A.* 59:1–3. The plain language of the definition of "public entity" excludes the AABB.

Furthermore, the Legislature did not create or authorize the AABB to perform a specific governmental purpose. Nor did the AABB act under contract with or at the direction of a public entity. *See Rodriguez v. New Jersey Sports & Exposition Auth.,* 193 *N.J.Super.* 39, 45–46, 472 *A.2d* 146 (App.Div.1983) (finding private security company operating under plan with Sports Authority shares the Authority's immunity); *Cobb v. Waddington,* 154 *N.J.Super.* 11, 18, 380 *A.2d* 1145 (App.Div.1977), *certif. den.,* 76 *N.J.* 235, 386 *A.2d* 859 (1978) (granting immunity to private contractor acting in accordance with Department of Transportation specifications). *But see Township of E. Brunswick v. Middlesex County Bd. of Freeholders,* 224 *N.J.Super.* 44, 50–51, 539 *A.2d* 756 (Ch.Div.1987) (finding that independent operator with authority to adopt plans for operation of landfill does not share Department of Environmental Protection's immunity). The AABB is a private, tax-exempt association created to meet the needs of the blood-banking industry. Merely because it has assumed regulato-

ry authority over that industry does not transform the AABB into a public entity entitled to immunity under the Tort Claims Act.

Reference in the DOH regulations to the AABB standards and inspections, moreover, does not extend state sovereignty to the AABB. In sum, we conclude that the lower courts correctly ruled that the AABB is not immune from liability under the Tort Claims Act, that the AABB owes a duty of ordinary care to persons receiving blood or blood products from its members, and that the AABB breached that duty in this case.

IV

Turning to the issue of charitable immunity, *N.J.S.A.* 2A:53A–7 provides:

> No nonprofit corporation ... organized exclusively for ... charitable, education-al or hospital purposes shall ... be liable to respond in damages to any person who shall suffer damage from the negligence of [the corporation or its agents]; provided, however, that such immunity from liability shall not extend to any person who shall suffer damage from the negligence of such corporation [or its agents] where such person is one unconcerned in and unrelated to and outside of the benefactions of such corporation....

To obtain immunity under the statute, a non-profit corpora-tion must establish that it was organized exclusively for charitable purposes. *Heffelfinger v. Town of Morristown,* 209 *N.J.Super.* 380, 383, 507 *A.*2d 761 (Law Div.1985). In determining whether an organization has a charitable purpose, "[t]he inquiry ... should focus on the essence of the entity itself." *Parker v. St. Stephen's Urban Dev. Corp.,* 243 *N.J.Super.* 317, 327, 579 *A.*2d 360 (App.Div. 1990).

The AABB performs many useful and socially beneficial functions, but it is not organized and devoted solely to religious, charitable, educational, or hospital purposes. Consequently, the charitable-immunity statute does not apply. *Kirby v. Columbian Inst.,* 101 *N.J.Super.* 205, 209–10, 243 *A.*2d 853 (Co.1968). As a trade association, the AABB promotes its interests and those of its dues-paying members. Although society benefits from the activi-ties of the AABB and its members, the AABB's promotion of its

members' interests is not a charitable function. The "essence" of the AABB is devoid of the charitable purpose that the statute requires. *Parker, supra,* 243 *N.J.Super.* at 327–28, 579 *A.*2d 360. Therefore, *N.J.S.A.* 2A:53A–7 does not protect the AABB from liability for its ordinary negligence.

## V

In resolving this matter, we have been assisted by *amicus* briefs submitted by several professional associations, including the American Association of Tissue Banks, the American Society of Association Executives, and the College of American Pathologists. Those briefs have enlightened our deliberations, and we are grateful for them. The associations have expressed concern that the imposition of liability on the AABB will inhibit them from conducting research, debating issues, developing guidelines, and communicating with public officials. Although we appreciate that concern, our opinion need not produce that effect. Fairly read, our opinion does not visit liability on the AABB because it was on the wrong side of a scientific debate or because it communicated its concerns to governmental officials.

We recognize, moreover, that the development of tests for infectious diseases often follows an indistinct path fraught with uncertainty, debate, trial and error, and even failure. At some point in the process, however, participants should recognize that they have enough information to act responsibly and that the failure to act would be irresponsible. Professional associations concerned with matters of public health are not fraternal organizations that exist solely for the benefit of their members. Playing a vital role in the protection of health, these associations are inescapably imbued with a public interest. The associations' commitment to public health should not immunize them from liability for the negligent discharge of their obligations. Nor should the associations enjoy immunity when they stubbornly reject persuasive evidence, unreasonably prolong the debate, and fail to inform their constituents of threats to the public health.

The record reveals that the AABB led the charge against direct questioning of donors and surrogate testing. Viewed most favorably to the AABB, the evidence suggests that it was concerned that such questioning and testing would be of limited effectiveness and could diminish the supply of blood and blood products. A less favorable view suggests that the AABB resisted surrogate testing because it did not want to suffer the added inconvenience and .costs of such testing. In assessing the role of governmental and private decisionmakers involved with donor screening, the Committee concluded "that it was reasonable to require blood banks to implement these two screening procedures [screening male donors for a history of sexual activity with other males and screening donated blood for the anti-HBc antibody] in January 1983." IOM Report, *supra*, at 6.

On the record, the jury could have concluded that the AABB in 1984 unreasonably resisted recognizing that blood transmits HIV. That resistance led the AABB to sacrifice an uncontaminated supply of blood for one that was contaminated, but more readily available. The jury could have found that if the AABB had not been so intransigent, its members, particularly the BCBC, would have instituted surrogate testing. Further, the jury could have found that if the BCBC had instituted surrogate testing, it would have rejected Unit 29F0784. Rejecting that unit could have prevented the transfusion of contaminated blood to William Snyder. It could have saved his health and his life. Against this background, we believe that the imposition of liability on the AABB is both fair and reasonable.

The judgment of the Appellate Division is affirmed.

GARIBALDI, J., dissenting.

As this Court recognizes, "[t]he imposition of a duty is the conclusion of a rather complex analysis that considers the relationship of the parties, the nature of the risk—that is, its foreseeability and severity—and the impact the imposition of a duty would have on public policy." *Crawn v. Campo*, 136 *N.J.* 494, 503, 643

A.2d 600 (1994) (quoting *Dunphy v. Gregor*, 136 *N.J.* 99, 108, 642 A.2d 372 (1994)). I agree with the majority that the relationship of the parties and the severe nature of the risk mandate a finding that the American Association of Blood Banks (AABB) owes a duty to blood recipients. However, the dictates of public policy, specifically the quasi-governmental nature of AABB in regulating blood banks lead me to conclude that AABB had a duty to act in good faith and is protected from liability for mere negligence. I say this fully aware that "[a]nytime a court raises the standard of care that defines the legal duty that is owed for the safety of others, it implicitly immunizes a part of the conduct," *Crawn, supra*, 136 *N.J.* at 502, 643 *A.*2d 600, but nevertheless conclude that public policy requires a grant of qualified immunity to AABB.

I

The decision to grant immunity to those working to promulgate governmental rules is based on a balancing of "myriad and weighty [factors] on both sides of the argument. Resolution of the issue involves a balancing of the citizen's interest in having a remedy for a wrong suffered and society's interest in attracting qualified persons to public office...." *Centennial Land & Dev. Co. v. Township of Medford*, 165 *N.J.Super.* 220, 227, 397 A.2d 1136 (Law Div.1979).

New Jersey and the federal government have both resolved those difficult policy questions, by statute, when a governmental official or agency is sued for actions such as those in this case. Mr. Snyder might have sued the United States, the State of New Jersey, or the individual officers responsible for negligently deciding not to implement surrogate testing, as the facts indicate that no governmental agency, including the United States Food and Drug Administration (FDA) and the New Jersey Department of Health (DOH), both of whom bore responsibility for regulating blood banks, ever recommended surrogate testing. However, absent any allegation of constitutional wrongdoing, such a case

would have been dismissed because of a defense of absolute immunity.

The Federal Tort Claims Act prohibits state tort suits against the government and its officials based on "the exercise or performance or the failure to exercise or perform a discretionary function." 28 U.S.C.A. § 2680(a); see also 28 U.S.C.A. § 2679(d)(2)(deeming all suits against officials to be suits against the United States and subject to all defenses available to the government). As the Supreme Court has explained, this rule prevents "judicial 'secondguessing'" of governmental decisions "grounded in social, economic and political policy." United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines), 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660, 674 (1984). Immunity is granted because of a concern that judges and juries will determine, with the benefit of hindsight, that a difficult policy decision that turned out to be wrong was negligently made.

To protect such governmental policy decisions, federal courts have dismissed lawsuits alleging negligent federal responses to new medical problems such as AIDS. For example, in C.R.S. by D.B.S. v. United States, 11 F.3d 791 (8th Cir.1993), a former soldier contracted AIDS during a blood transfusion at a military hospital in December 1983. The soldier sued, alleging that the military was negligent in adopting the AABB/FDA standards issued in March 1983 after the January 4, 1983, meeting. Id. at 794–95. The court determined that "the issue of what screening procedures to adopt is precisely the type of policy-bound decision that Congress intended to insulate from judicial scrutiny through the discretionary function exception," and thus granted summary judgment for the government. Id. at 797; see also Lockett v. United States, 938 F.2d 630 (6th Cir.1991) (affirming dismissal of claim challenging EPA response to PCB contamination as negligent); Prescott v. United States, 858 F.Supp. 1461, 1468 (D.Nev. 1994) (dismissing suit alleging negligence by Atomic Energy Commission in setting level of authorized radiation exposure because the levels "were the product of extensive analysis ... and clearly

involved the weighing and balancing of a number of social, economic and political considerations based on then available scientific and medical data").

New Jersey has adopted a similar rule of absolute immunity. *N.J.S.A.* 59:2–3 relieves public entities from liability for "an injury resulting from the exercise of judgment or discretion vested in the entity." *N.J.S.A.* 59:3–2 provides similar immunity to the governmental employee responsible for such decisions. The statutes provide "broad immunity for discretionary acts which has also been adopted ... [by] the federal government." *N.J.S.A.* 59:2–3, comment. This Court has interpreted the statute to protect "the exercise of judgment or discretion in making basic policy.... upon proof that discretion was actually exercised at that level by an official who, faced with alternative approaches, weighed the competing policy considerations and made a conscious choice." *Costa v. Josey,* 83 *N.J.* 49, 59, 415 *A.*2d 337 (1980).

Courts have identified several policy concerns justifying the grant of absolute (rather than qualified) immunity to those governmental officials who make sensitive policy decisions. As the Supreme Court explained, the threat of lawsuits "would consume time and energies which would otherwise be devoted to governmental service and the threat of which might appreciably inhibit the fearless, vigorous, and effective administration of policies of government." *Barr v. Matteo,* 360 *U.S.* 564, 571, 79 *S.Ct.* 1335, 1339, 3 *L.Ed.*2d 1434, 1441 (1959).

The threat that liability will inhibit effective and vigorous government is the result of the governmental official's position. The ordinary negligence rule is designed to encourage actors to act only when the benefits outweigh the costs. Ordinarily, the threat of liability will deter a person from acting if the costs outweigh the benefits because the actor will be forced to pay those costs in a lawsuit; if the benefits outweigh the costs, the actor will proceed knowing that it will not be held liable and will enjoy the benefits. As a result, the optimal outcome is achieved. Richard A. Posner, *A Theory of Negligence,* 1 *J. Legal Stud.* 29, 32–33 (1972).

However, the theory of negligence breaks down with government employees:

> The nub of the issue lies in the implicit imbalance in the incentives imposed on public officials if left wholly unprotected by any immunity doctrine. Let them make an incorrect decision and they will have to shoulder the enormous costs of liability. Let their decisions be correct and there will be enormous gains, which will be captured not by them, but by the public at large. Why, therefore, should a public official take all the risks for none of the gain?.... One way to restore the [proper] balance would be to pay public officials enormous sums to compensate them for the great liability risks.... The other way to restore the needed symmetry between official rewards and official burdens is to release the public official from liability, in whole or in part. In this way the system is brought into balance, since the official in question escapes capturing the full gain or bearing the full loss, albeit at the cost of individual redress for government wrongs.

> [Richard A. Epstein, *Cases and Materials on Torts* 878–79 (5th Ed.1990) ]

A grant of immunity restores the balance and encourages efficient and appropriate government decisions.

Courts have identified several additional concerns, including a fear that lawsuits would deter public-spirited individuals from entering public service. *See, e.g., Lister v. Board of Regents of Univ. of Wis. System,* 72 *Wis.*2d 282, 240 *N.W.*2d 610, 621 (1976). That policy concern is particularly important in cases such as this one, when the government is required to determine important and difficult questions of public policy, and "courts, utilizing standard tort principles, are ill-equipped to interfere with them." *Costa, supra,* 83 *N.J.* at 55, 415 *A.*2d 337.

## II

While the State of New Jersey and the United States would be absolutely immune from suit in this case, the AABB, of course, is not a governmental agency but a private organization that has assumed certain governmental responsibilities. However, while specific statutes do not provide immunity to the AABB or other private volunteers, the "statutory immunities are reflective of public policy and may serve as a guide to the evolution of related common law immunities." *Crawn, supra,* 136 *N.J.* at 504, 643 *A.*2d 600. Many of the same policy concerns that motivated the

grant of immunity to public officials apply to the question of immunity for the AABB.

The AABB is an organization with thousands of members, including nearly all of the community blood banks in this country and several thousand doctors. It describes itself as seeking "to develop and recommend standards on the practice of blood banking, to help promote the public health, ... and to conduct numerous programs for communication and education among organization members and the public at-large." *Ante* at 277, 676 *A*.2d at 1040. As the 1992 AABB Annual Report describes, AABB "members also join for representation," and the Association conducts public relations campaigns and federal and state legislative lobbying. Most important to Mr. Snyder's case, the AABB also acts as a regulatory body. As the majority explains, the AABB, through its volunteer committees, provides accreditation to member blood banks that comply with its standards.

All of the people who serve on the AABB's numerous committees and perform those tasks are uncompensated volunteers from top academic and research institutions, and not high-paid executives concerned only with the bottom line. For example, Dr. Bove is a member of the faculty at Yale University and also serves as the Associate Director of Clinical Laboratories at Yale–New Haven Hospital. Dr. Harold Oberman, another of defendant's witnesses, has edited the AABB's publications on blood bank standards and is a professor of pathology and laboratory director at University of Michigan. Dr. Carol Bell, who served on several AABB committees and also appeared as a witness, is a clinical professor of pathology at University of Southern California and at University of California at Irvine, as well as Director of Laboratories at Brotman Medical Center in California.

A blood bank in New Jersey cannot operate without licenses from both the FDA and the DOH. *Ante* at 276, 676 *A*.2d at 1040. Many states have opted to forego regulation and defer entirely to the AABB in establishing standards, but New Jersey only partially defers to the AABB as a blood-bank regulatory body. In 1984,

under DOH regulations, DOH required blood banks to meet both the FDA and AABB standards pertaining to medical histories and physical examinations of donors. *N.J.A.C.* 8:8–5.2 (May 21, 1984). At that time the AABB standards were more stringent than those of the FDA. When renewing blood-bank licenses, DOH accepted AABB inspection reports in lieu of making its own inspections. *N.J.A.C.* 8:8–1.4(b) (May 21, 1984). DOH also accepted AABB's standards for obtaining medical histories and conducting physical examinations of donors. *N.J.A.C.* 8:8–5.2 (May 21, 1984). "Thus, if a blood bank failed the annual AABB inspection on the taking of medical histories, that bank could lose its license to operate in New Jersey." *Ante* at 297, 676 *A.*2d at 1050.

Moreover, DOH continues to rely on AABB. In its regulations DOH presently requires blood banks to conform to FDA or AABB standards, "whichever is more stringent," in quality control, *N.J.A.C.* 8:8–4.1(b)(4), donor examination policies, *N.J.A.C.* 8:8–6.2, and preparation of blood, *N.J.A.C.* 8:8–7.1. AABB standards are, and historically have been, stricter than FDA rules. Thus, New Jersey has delegated part of its regulatory responsibility to AABB. As the majority explains, "at least in New Jersey in 1984, AABB was not a mere advisory body. It exercised control of its member banks, including BCBC." *Ante* at 297, 676 *A.*2d at 1050.

The United States, through the FDA, further regulates those blood banks that transfer their products across state borders. *See* 42 *U.S.C.A.* § 262(a). Unlike DOH, the FDA has not officially delegated any power to AABB. However, I agree with plaintiff's conclusion that AABB was involved in the federal decision-making process and helped formulate the federal response to AIDS in 1983–84. AABB representatives participated in the January 4, 1983 meeting and in the FDA Task Force that rejected surrogate testing in March 1984. Indeed, plaintiff's witnesses, including Dr. Engerman and Dr. Marcus Conant, testified that AABB *caused* the federal response that rejected surrogate testing and direct screening in favor of indirect screening and educational efforts. As the majority correctly concludes, "the AABB was a major

player in both state and federal government in setting blood policy in the 1980s." *Ante* at 297, 676 *A*.2d at 1050. AABB's actions here were directly intertwined with, and to a large extent constituted, governmental regulation.

### III

When a private organization performs a quasi-governmental task that the state would otherwise have to perform, public policy requires a grant of immunity. Otherwise, the private organization "might well refuse" to perform the task at all, thereby "increas[ing] the load on the strained resources" of the state. *Sherman v. Four County Counseling Ctr.*, 987 *F*.2d 397, 406 (7th Cir.1993). *See also Warner v. Grand County*, 57 *F*.3d 962, 967 (10th Cir.1995)("If [private parties] are not permitted to raise the shield of qualified immunity, they might reject requests to aid state officials in performing government functions."). As it does for public officials, immunity alleviates the fear and expense of litigation, the diversion of personal energy from pressing public issues, and the deterrence of qualified private parties from serving the public interest. *See Sherman, supra*, 987 *F*.2d at 406; *Corey v. New York Stock Exch.*, 691 *F*.2d 1205, 1211 (6th Cir.1982); *cf. Harlow v. Fitzgerald*, 457 *U.S.* 800, 814, 102 *S.Ct.* 2727, 2736, 73 *L.Ed.*2d 396, 408 (1982). Granting immunity to non-profit associations who have assumed some governmental duties will ensure that, undaunted by the prospect of litigation expense and potential damage awards, they will continue to perform the essential public service that they alone are well-positioned to undertake: the good-faith development of industry standards to protect the public health and safety.

Many courts have recognized that those policy concerns do apply to private parties acting in a governmental capacity and have therefore extended immunity to them. In *Berends v. City of Atlantic City*, 263 *N.J.Super.* 66, 621 *A*.2d 972 (App.Div.1993), an airplane crashed while attempting to land at an Atlantic City airport that was operated by Pan Am Management Systems, Inc.

(Pan Am). Plaintiff's theory was that the city's decision to close down one of the two runways had led to a dangerous condition that caused the crash. The court dismissed the claim against the city because "the city enjoyed immunity under *N.J.S.A.* 59:2–3a," since the decision was a high-level policy judgment. *Id.* at 81, 621 *A.*2d 972. The court also dismissed the claim against Pan Am:

Pan Am engaged in and made a significant contribution to the process which, as we have held, shields the city from liability. It would be anomalous to punish Pan Am for postponing the reopening of runway 4–22 when the postponement resulted from its participation in a thoughtful and professional multiagency evaluation process upon which the city's immunity is founded.

[*Id.* at 83, 621 *A.*2d 972.]

Similarly, it would be anomalous to punish the AABB for its actions since its decisions resulted from its participation in a process on which the government's immunity is founded.

The majority attempts to distinguish *Berends* in several ways, but none are persuasive. First, the majority asserts that "Pan Am's claim of governmental immunity relates back to the contract with Atlantic City.... Unlike Pan Am, the AABB did not act pursuant to a contract with any governmental agency." *Ante* at 298, 676 *A.*2d at 1051. However, the panel in *Berends* explicitly refused to base its decision upon Pan Am's contract with Atlantic City, since the contract had not been placed into evidence. *Berends, supra,* 263 *N.J.Super.* at 82, 621 *A.*2d 972.

The majority also claims that "Pan Am operated the airport under strict federal and state regulation," whereas the blood-banking industry was governed by "more lenient" government regulations. *Ante* at 298, 676 *A.*2d at 1051. Of course, "state and federal regulations apply to ... the blood-banking industry." *Id.* at 276, 676 *A.*2d at 1039. The majority suggests that Pan Am was granted immunity because, in this Court's view, airport regulations are better than blood-banking regulations. This assertion, without a shred of proof, lends added credence to the legislative concern that the judiciary should not "secondguess" policy decisions because courts "are ill-equipped to interfere" with such decisions. *Costa, supra,* 83 *N.J.* at 55, 415 *A.*2d 337.

Finally, the majority argues that the decision-making process in *Berends* was different in that it involved a multi-agency decision-making process including public hearings and participation. *Ante* at 298, 676 *A*.2d at 1051. That is a curious claim, since the AABB's opposition to core testing was first made known at a meeting attended by members of the CDC, FDA, National Institutes of Health, AABB, American Red Cross, Council for Community Blood Banks, National Hemophilia Foundation, National Gay Task Force, New York Health Department, San Francisco Health Department, and other organizations. *See Ante* at 284, 676 *A*.2d at 1043. Thus, the meeting was attended by government regulators, blood bankers, and private organizations representing the interest of those blood recipients most concerned about a safe blood supply, those with hemophilia. In fact, the decision-making process here was quite similar to that in *Berends*, and the AABB, like Pan Am, should be granted immunity as a result of its participation in the multi-agency decision-making process from which the government's immunity is derived.

The Seventh Circuit's decision in *Sherman* also supports a finding of qualified immunity for the AABB.

In *Sherman, supra*, 987 *F*.2d at 405–06, the court conferred immunity on a private hospital that was sued for its actions in treating a patient. In treating the patient, the hospital was "fulfilling a public duty" to care for a patient who would otherwise have been treated by a public hospital. *Id.* at 406. Had the public hospital performed the same services, it "would be protected by qualified immunity," and the court therefore reasoned that the private hospital should be similarly protected to encourage private assistance to the government. *Id.* at 405. Similarly, since New Jersey and the FDA would be entitled to immunity for a decision not to conduct surrogate testing, the AABB should also be given immunity for making a decision that would otherwise have been made by DOH and FDA.

Courts have granted immunity to private parties for their good-faith performance of quasi-governmental tasks in a wide range of

contexts, in recognition of the applicability of the same public policies requiring governmental immunity. *See, e.g., Warner, supra,* 57 *F.*3d at 964–67 (conferring immunity from § 1983 suits on private actor who performed strip search at officer's direction); *Austern v. Chicago Bd. Options Exch., Inc.,* 898 *F.*2d 882 (2d Cir.) (granting absolute immunity for all quasi-judicial actions to arbitrators who heard case pursuant to contractual arbitration clause), *cert. denied,* 498 *U.S.* 850, 111 *S.Ct.* 141, 112 *L.Ed.*2d 107 (1990); *Kwoun v. Southeast Mo. Professional Standards Review Org.,* 811 *F.*2d 401, 407–09 (8th Cir.1987)(conferring tort and § 1983 immunity on private medical peer review group that conducted quasi-prosecutorial medical performance review), *cert. denied,* 486 *U.S.* 1022, 108 *S.Ct.* 1994, 100 *L.Ed.*2d 226 (1988); *Wasyl, Inc. v. First Boston Corp.,* 813 *F.*2d 1579 (9th Cir.1987) (granting immunity to appraisers who performed quasi-judicial acts); *Austin Mun. Sec., Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.,* 757 *F.*2d 676, 689–92 (5th Cir.1985)(conferring § 1983 immunity on private securities association for its "quasi-governmental" regulation of securities market); *Bushman v. Seiler,* 755 *F.*2d 653 (8th Cir.1985) (conferring tort immunity on employee of Medicare carrier); *Corey, supra,* 691 *F.*2d at 1208–11 (conferring immunity on private arbitrators performing quasi-judicial duties.); *Lundgren v. Freeman,* 307 *F.*2d 104, 118 (9th Cir.1962) (conferring immunity on architect acting as arbitrator pursuant to contract because policy of judicial immunity "extends to private persons acting [as arbitrators] in a quasi-judicial capacity within jurisdiction established by private agreement."); *Citrano v. Allen Correctional Ctr.,* 891 *F.Supp.* 312, 317 (W.D.La.1995)(conferring immunity on private contractor operating a prison since "they are the functional equivalent of state prison employees, and as such, the same rationales underlying the grant of qualified immunity to state prison officials have equal application to them."); *Weissman v. Hassett,* 47 *B.R.* 462 (S.D.N.Y.1985) (granting tort immunity for bankruptcy trustee in certain instances); *Lythgoe v. Guinn,* 884 *P.*2d 1085, 1087 (Alaska 1994)(conferring tort immunity on court-appointed psychologists, in accord with "virtual uniformity" of other decisions, since threat

of liability would deter their acceptance of court appointments); *Craviolini v. Scholer & Fuller Assoc. Architects,* 89 *Ariz.* 24, 357 *P.*2d 611 (1960) (recognizing tort immunity for private arbitrators); *Latt v. Superior Ct.,* 212 *Cal.Rptr.* 380 (Ct.App.1985)(conferring tort immunity on court-appointed corporate director because "[i]t is patently unfair to burden a court's delegate ... with civil liability for judicial acts performed for which a judge exercising the same functions could not be civilly liable."), *review granted,* 215 *Cal.Rptr.* 851, 701 *P.*2d 1169 (1985), *review vacated,* 223 *Cal.Rptr.* 266, 713 *P.*2d 1196 (1986); *Rubenstein v. Otterbourg,* 78 *Misc.*2d 376, 357 *N.Y.S.*2d 62, 63–64 (N.Y.City Civ.Ct.1973)(conferring immunity on arbitrator association because "[t]hey perform with respect to arbitrator's functions similar to those performed by the Judicial Conference, the Administrative Board and the Appellate Division with respect to judges."); *City of Durham v. Reidsville Engineering Co.,* 255 *N.C.* 98, 120 *S.E.*2d 564, 567 (1961)(conferring immunity on engineer who approved payments during construction because engineer acts in quasi-judicial capacity).

This case provides another context in which the Court should grant immunity to a private actor performing governmental duties. The majority seeks to distinguish those cases by noting that "[i]n each case in which a court has recognized a private entity's claim of immunity, the entity had performed quasi-governmental functions pursuant to a governmental grant of authority," *ante* at 296, 676 *A.*2d at 1050, while "the AABB acted without the benefits of governmental authority." *Ante* at 296, 676 *A.*2d at 1050.

However, that claim is unpersuasive and wrong for two reasons. First, the AABB acted under the benefit of authorizing DOH regulations promulgated in 1984 and continues to operate under current DOH regulations. *Supra* at 277, 676 *A.*2d at 1040. *N.J.S.A.* 26:2A–7 requires that DOH establish rules and regulations governing blood bank procedures. Pursuant to this delegation of legislative power, "DOH incorporated into its regulations

AABB standards." *Ante* at 299, 676 *A.*2d at 1051. Similarly, "FDA regulations allowed blood banks to rely on AABB standards as long as they are consistent with, and at least as stringent as, FDA regulations." *Ibid.* The majority seeks to have it both ways: finding a duty of care and liability because of the governmental authority delegated to the AABB, but then denying immunity because of a perceived lack of governmental authority. In fact, the FDA and DOH delegated power to the AABB, and AABB's exercise of this power should also be accorded immunity.

Secondly, as many courts have recognized, "immunity does not depend upon the source of the decision-making power but rather upon the nature of that power." *Corey, supra,* 691 *F.*2d at 1211; *accord Citrano, supra,* 891 *F.Supp.* at 318. The decision to grant immunity is based on a desire to protect and to encourage certain types of decisionmaking processes. It is not grounded on the existence of a legislative grant of power. The military was relieved from liability for transmission-related AIDS in *C.R.S. by D.B.S., supra,* not because there was a specific legislative grant of authority to the military to decide blood policy, but because the decision was a "policy-bound decision" for which judicial review is inappropriate. 11 *F.*3d at 797. That concern extends to any such decision, whether made pursuant to a specific grant of authority or not. Similarly, the Supreme Court's concern in *Barr, supra,* that liability would inhibit vigorous and appropriate decisionmaking processes does not depend on the existence of a grant of governmental authority.

Indeed, there was no legislative grant of power in many of the cases where courts have recognized quasi-governmental immunity. Thus, in *Craviolini, supra,* the court recognized quasi-judicial immunity, "bestowed by public policy," for architects who arbitrate disputes pursuant to private construction contracts, even though there was no grant of power from the government. 357 *P.*2d at 613. Similarly, the Ninth Circuit has held that the public policy in favor of judicial immunity, granted to "prevent fear of suit from influencing their decisions," should extend to private

persons acting in a quasi-judicial capacity pursuant to "private agreement." *Lundgren, supra,* 307 *F.*2d at 117, 118. *See also Austern, supra,* 898 *F.*2d at 886 (granting immunity to arbitrators appointed pursuant to private contract because of the "functional comparability" to judges). Those courts have all recognized what the Court today does not: immunity for quasi-governmental activity does not depend on the source of power but rather upon the nature of the decision-making process.

## IV

Courts have ordinarily granted the same immunity to private groups conducting quasi-governmental activity as that accorded to government employees performing similar functions. For example, in *Berends, supra,* Pan Am was given the same level of immunity granted to Atlantic City. That result has been justified because the public policy behind the grant of immunity is so similar in both the public and private context. As a result, those cases might dictate a grant of absolute immunity to AABB "upon proof that discretion was actually exercised" at the level of basic policy, and that AABB "weighed the competing policy considerations" in reaching its decision. *Costa, supra,* 83 *N.J.* at 59, 415 *A.*2d 337. However, I conclude that there are public policy interests requiring that AABB should receive only qualified immunity for its performance of discretionary functions, protecting it from liability "providing what [it] do[es] is done in good faith." *Bedrock Foundations, Inc. v. Geo. H. Brewster & Son, Inc.,* 31 *N.J.* 124, 142, 155 *A.*2d 536 (1959) (quoting *Johnson v. Marsh,* 82 *N.J.L.* 4, 85 *A.* 761 (Sup.Ct.1912)). *See also Bombace v. City of Newark,* 125 *N.J.* 361, 374, 593 *A.*2d 335 (1991) (defining good-faith immunity as protecting defendant from liability when, objectively or subjectively, defendant acted in good faith); *Restatement (Second) of Torts* § 895D, cmt. e (1977).

Qualified immunity is "the best attainable accommodation of competing values," *Harlow, supra,* 457 *U.S.* at 814, 102 *S.Ct.* at 2737, 73 *L.Ed.*2d at 408, because it simultaneously preserves both

the incentive of private associations to continue developing industry rules and the right of injured parties to seek relief in extreme cases where malice or bad faith can be demonstrated. Unlike governmental officials, the threat of electoral removal is not a deterrent, because AABB's constituency is blood banks and doctors, not those harmed by HIV-tainted blood. *Cf. Lister, supra,* 240 *N.W.*2d at 621. Moreover, AABB acts not only as a public-interested regulator but also as a lobbyist for the blood bank industry, and it is therefore motivated by the industry's interests as well as the public good. Thus, unlike a government employee, AABB enjoys some of the benefits of its decisions.

As a result, complete immunity might encourage AABB to make negligent decisions because it would bear none of the costs and enjoy some of the benefits of its decisions. Liability for negligence, without any immunity (the Court's standard), might also deter effective decisions—because most of the benefits of an AABB decision are enjoyed by the public, AABB might hesitate from taking some appropriate actions if its own benefit would not be as great as the overall cost, even if the overall benefit exceeds that cost. *Cf.* Epstein, *supra,* at 878–79; *Lundgren, supra,* 307 *F.*2d at 118 (granting qualified immunity to architect who arbitrated disputes between an owner and contractor, court rejected absolute immunity accorded to judges because architect, unlike judges, had some self-interest in the outcome). Qualified immunity allows AABB to make proper decisions, relieved of some liability, but imposes a sufficient check against decisions that are clearly wrong and motivated by profit.

The majority professes concern for the difficulties faced by AABB and other similarly-situated groups, recognizing that the development of tests "often follows an indistinct path fraught with uncertainty, debate, trial and error, and even failure" and claims that the Court is not just penalizing AABB for taking a wrong position. *Ante* at 304, 676 *A.*2d at 1053. However, by defining a duty of ordinary care, the majority is doing exactly what it seeks to avoid: allowing liability when, in the face of uncertain evidence,

AABB, together with all the government regulatory agencies, made a decision that subsequent developments proved wrong. We grant immunity to the government in such situations because we recognize the difficulty of decisions in this area. The majority's failure also to grant immunity to AABB ensures that non-governmental agencies will be increasingly unwilling to participate in the regulatory process and assist the government in policy formulation at a time when government and the public increasingly rely on such organizations to develop industry standards.

V

Admittedly, the decision reached by AABB and the government health agencies appears negligent with the perspective of 20/20 hindsight. We know now that the AIDS virus is transmitted by blood and that people, like Mr. Snyder, were unfortunately infected through transfusions. In 1996, concerns about a diminished blood supply and public hysteria pale in the face of a blood recipient tragically infected with the AIDS virus. However, the participants in the vigorous public debate in 1983–84 about the utility of core testing did not have such a clear view of the future. Opponents of the core test expressed several concerns about core testing: (1) the test would exclude a half-million blood donors who did not have HIV, causing blood shortages and panic as hundreds of thousands of people who had engaged in no high-risk activity would fear that they had contracted HIV; (2) the test would screen out members of certain Asian ethnic groups, because many had been exposed to hepatitis, even though almost none were HIV-positive; (3) members of high-risk groups would come and give blood under the impression that they could then find out whether they had HIV; because the core test was not perfect, this would result in increased contamination of the blood supply. (When the ELISA test was introduced, the government set up alternative testing sites specifically to avoid that problem).

It is important to emphasize that every governmental agency agreed with AABB in refusing to use surrogate testing. Dr.

Conant, one of plaintiff's experts, testified that surrogate testing was not required by any state or federal agency, or by any other country in the world. At the federal level, the FDA never recommended core testing—in March 1984, its Blood Products Advisory Committee recommended that "such testing was inappropriate." Even though Dr. Francis's Task Force inside the Center for Disease Control (CDC) urged the use of surrogate testing, CDC itself never made such a recommendation. Indeed, the U.S. Assistant Secretary for Health, Dr. Edward Brandt, stated in a letter dated June 15, 1983, that

[T]he test for antibody to hepatitis B core antigen (anti-core) had, as you pointed out, been proposed as a screen for possible AIDS carriers.... *I believe there is now a general consensus by experts in this area that anti-core is unsatisfactory as a screening test for AIDS carriers.*

[ (emphasis added) ]

Dr. Donald Louria, a professor at University of Medicine and Dentistry of New Jersey, explained that no government agencies required the use of surrogate tests because, by 1984, no article in a peer-review journal had yet appeared arguing in favor of core testing. In fact, the few published studies had found that the core test would not be effective and would be unsound public policy. (Dr. Spira's data had not been approved for publication in a peer-review journal, and many scientists were skeptical of his conclusions).

Policy experts were required to balance those risks to the public with the advantages of testing. In 1983–84, all of the policy-making agencies decided against core testing because they determined, as a matter of policy, that the potential benefits to the public from core testing did not outweigh the costs to the public. That is just the "type of policy-bound decision" that the federal and state governments "intended to insulate from judicial scrutiny through the discretionary function exception." *C.R.S. by D.B.S. v. United States, supra,* 11 *F.*3d at 797.

## VI

I agree with the majority that AABB is not entitled to charitable immunity. I also agree that AABB does have a duty to

recipients of blood products. I respectfully dissent, however, from the majority's finding that ordinary negligence is the appropriate standard of care to measure AABB's conduct. Because of AABB's quasi-governmental nature in regulating blood banks, AABB should be entitled to qualified immunity.

AABB's decision to adopt educational efforts and indirect donor screening instead of surrogate testing was "the exercise of judgment or discretion in making basic policy." *Costa, supra,* 83 *N.J.* at 59, 415 *A.*2d 337. If AABB can establish that, when "faced with alternative approaches, [it] weighed the competing policy considerations and made a conscious choice," *ibid.,* then it should be entitled to qualified immunity, and Mr. Snyder would need to prove bad faith or malice to recover. I would therefore reverse the judgment of Appellate Division and remand the matter to the Law Division for a new trial to consider whether AABB acted in bad faith or with malice in refusing to implement the surrogate test.

*For affirmance*—Chief Justice WILENTZ, and Justices HANDLER, POLLOCK, O'HERN, STEIN and COLEMAN—6.

*For reversal & remandment*—Justice GARIBALDI—1.