193 N.J. Super. 39 (1983)
472 A.2d 146
CRISPIN RODRIGUEZ AND SONIA RODRIGUEZ, PLAINTIFFS-APPELLANTS,
v.
NEW JERSEY SPORTS & EXPOSITION AUTHORITY AND PINKERTON'S, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued October 12, 1983.
Decided December 2, 1983.
*40 Before Judges MICHELS, KING and DREIER.
David A. Bolson argued the cause for appellants (Friedman, Carney & Wilson, attorneys; David A. Bolson, of counsel and on the brief).
Roger C. Wilson argued the cause for respondent New Jersey Sports & Exposition Authority (Zucker, Facher & Zucker, attorneys; Roger C. Wilson, of counsel and on the brief).
*41 Robert J. Maloof argued the cause for respondent Pinkerton's, Inc. (Hein, Smith & Berezin, attorneys; Robert J. Maloof, of counsel and on the brief).
The Opinion of the Court was delivered by MICHELS, P.J.A.D.
Plaintiffs Crispin Rodriguez and Sonia Rodriguez appeal from summary judgments of the Law Division entered in favor of defendants New Jersey Sports & Exposition Authority (Authority) and Pinkerton's, Inc. (Pinkerton's) that, based upon the immunity provisions of the New Jersey Tort Claims Act, dismissed their complaint for personal injuries and property damages. N.J.S.A. 59:1-1, et seq.
The facts are relatively simple and essentially undisputed. On the evening of April 30, 1979 Crispin Rodriguez (Rodriguez) was a patron at the Meadowlands Race Track which is owned and operated by the Authority. He won the "Trifecta", the tenth and last race of the evening, and collected in excess of $4,000 in cash. He left the racetrack and while proceeding to his automobile, which was parked in one of the Authority's parking areas, was assaulted by three men who fractured his jaw and robbed him of his winnings. Rodriguez instituted this action against the Authority and Pinkerton's, which provided contract security service to the Meadowlands Complex, to recover damages for the personal injuries and the loss of the winnings sustained as a result of the assault and robbery. His wife sued per quod. Rodriguez contended that the assault and robbery were "allowed and caused to occur as a result of inadequate and ineffective security." Specifically, he charged the Authority and Pinkerton's with failing to (1) provide proper security and lighting, (2) warn of known dangers and (3) take reasonable precautions to assure that no harm would come to those lawfully on the premises. After the issue was joined and discovery completed, defendants moved for summary judgment. Judge Cassidy in the Law Division held that N.J.S.A. 59:5-4 of the Tort Claims *42 Act granted absolute immunity to defendants for the injuries and damages sustained by plaintiffs. Summary judgments were therefore entered in favor of defendants and this appeal followed.

I.
Tort claims against public entities, such as the Sports Authority, are governed by the provisions of the Tort Claims Act. The Tort Claims Act re-establishes an all-inclusive immunity from tort liability for public entities absent specific provisions therein imposing liability upon them. Coppola v. State, 177 N.J. Super. 37, 39 (App.Div. 1981), certif. den. 87 N.J. 398 (1981); Burg v. State, 147 N.J. Super. 316, 320 (App.Div. 1977), certif. den. 75 N.J. 11 (1977); English v. Newark Housing Authority, 138 N.J. Super. 425, 428-429 (App.Div. 1976); Keller v. County of Somerset, 137 N.J. Super. 1, 6 (App.Div. 1975). The legislative policy underlying the Tort Claims Act is set forth in N.J.S.A. 59:1-2, which states:
The Legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the traditional doctrine of sovereign immunity. On the other hand the Legislature recognizes that while a private entrepreneur may readily be held liable for negligence within the chosen ambit of his activity, the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein. All of the provisions of this act should be construed with a view to carry out the above legislative declaration. [Emphasis supplied].
In furtherance of this stated policy, N.J.S.A. 59:2-1 provides in pertinent part, that:
a. Except as otherwise provided by this act, a public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person.
Among the specific immunities granted public entities by the Tort Claims Act is immunity from liability for injuries and damages resulting from the failure to provide police protection *43 or the failure to provide sufficient police protection. N.J.S.A. 59:5-4 specifically provides:
Neither a public entity nor a public employee is liable for failure to provide police protection service or, if police protection service is provided, for failure to provide sufficient police protection service.
The legislative purpose underlying this provision is to protect the public entity's "essential right and power to allocate its resources in accordance with its conception of how the public interest will best be served, an exercise of political power which should be insulated from interference by judge or jury in a tort action." Suarez v. Dosky, 171 N.J. Super. 1, 9 (App.Div. 1979), certif. den. 82 N.J. 300 (1980). Thus, the public entity can determine with impunity whether to provide police protection service and, if provided, to what extent. See Suarez v. Dosky, supra; Wuethrich v. Delia, 134 N.J. Super. 400 (Law Div. 1975); 155 N.J. Super. 324, 326 (App.Div. 1978), certif. den. 77 N.J. 486 (1978).
The gravamen of Rodriguez's claim is that the Authority did not provide adequate and effective security for him and other patrons at the Meadowlands Racetrack. This essentially is a claim that the Authority did not provide "sufficient police protection service" and hence falls squarely within the broad immunity granted to the Authority and its employees by N.J.S.A. 59:5-4. The Authority determined to provide police protection service by contracting Pinkerton's, a competent security force, to aid in the protection and security of the Meadowlands complex. Although the Authority, through Pinkerton's, may not have provided sufficient security personnel or deployed them in such a way as to prevent the assault and robbery of Rodriguez, such conduct cannot serve as a basis for the imposition of tort liability against the Authority or its Director of Security, John Crusas.

II.
Furthermore, the Authority is insulated from liability for plaintiffs' injuries and damages by N.J.S.A. 59:2-7, which provides:

*44 A public entity is not liable for failure to provide supervision of public recreational facilities; provided, however, that nothing in this section shall exonerate a public entity from liability for failure to protect against a dangerous condition as provided in chapter 4.
The term "dangerous condition" is defined by N.J.S.A. 59:4-1(a), as follows:
a. "Dangerous condition" means a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used.
There cannot be the slightest doubt that the mere presence at the Meadowlands complex of persons with criminal intent or purpose does not constitute a dangerous condition within the meaning of the foregoing statutes so as to impose liability upon the Authority. To the contrary, liability cannot be visited upon the Authority under the Tort Claims Act by reason of the criminal assault and robbery of Rodriguez. See Setrin v. Glassboro State College, 136 N.J. Super. 329, 333 (App.Div. 1975).

III.
Plaintiffs also contend that because of Pinkerton's independent negligence in carrying out its duties under the security contract the trial court erred in entering summary judgment in favor of Pinkerton's on the ground that it shared immunity with the Authority under N.J.S.A. 59:5-4. Specifically, plaintiffs charge that Pinkerton's, in violation of the security plan, left all parking areas unguarded after the ninth race in order to direct traffic. The record, although fragmented and sparse, shows that the Authority determined the number of security personnel that would be needed each week and how they were to be deployed. The Authority's Director of Security testified that he determined which posts were to have permanent guards. He also testified that in addition to the guards at permanent posts there were roving guards. Pinkerton's Project Manager Patrick Malone testified that the bulk of the security force was on the road, assigned to traffic posts. In addition, there were two guards and three supervisors roving 15 of the 18 parking areas normally used on weekend nights. According to Malone there *45 normally would be 18,000 to 20,000 cars in these parking areas, and following the ninth or next to last race all the roving guards were assigned to direct traffic leaving the complex.
The scope of a public contractor's shared immunity is accurately set forth in Annot., Right of Contractor with Federal, State or Local Public Body to Latter's Immunity From Tort Liability, 9 A.L.R.3d 382, 389 (1966) as follows:
It is a well-settled general principle that one who contracts with a public body for the performance of public work, if not guilty of negligence or wilful tort, and if not employing ultrahazardous methods, is entitled to share the immunity of the public body from liability for incidental injuries necessarily involved in the performance of the contract.
Our cases have recognized that a public contractor, such as Pinkerton's, is not liable for work done in accordance with plans and specifications furnished by a public entity, such as the Authority, where the work is performed under the guidance and supervision of representatives of the public entity. For example in Lydecker v. Freeholders of Passaic, 91 N.J.L. 622, 626-627 (E. & A. 1912), the court noted:
We are of opinion that a contractor with a municipality for public work is not liable under his contract to a third party for injuries resulting from a mistaken estimate by the municipality as to the effect of the performance of the contract according to the means and method it requires, or for the sufficiency of its provisions to fulfill a duty which the municipality owes to the public, unless the work and required method of performance is obviously or inherently dangerous, of which the contractor had notice, or was chargeable therewith.
See also Cobb v. Waddington, 154 N.J. Super. 11, 15-17 (App.Div. 1977), certif. den. 76 N.J. 235 (1978); Sanner v. Ford Motor Co., 144 N.J. Super. 1, 5 (Law Div. 1976), aff'd 154 N.J. Super. 407 (App.Div. 1977), certif. den. 75 N.J. 616 (1978); Springfield Tp. v. N.J. Hwy. Dept., 91 N.J. Super. 567, 578-584 (Law Div. 1966).
A public contractor may, as pointed out in the annotation quoted above, be held liable when negligent in the execution of the contract. See Terranella v. Union Bldg. and Construction Co., 3 N.J. 443, 446-447 (1950). Cf. Berg v. Reaction Motors Division, 37 N.J. 396, 415-416 (1962). However, plaintiffs have failed to show that Pinkerton's was independently negligent. Pinkerton's duty to "aid in the protection and security" *46 of the Meadowland's complex was prescribed by the terms of its contract with Authority. Although the contract provided that the manner and method of operating the security function rested with Pinkerton's as it applied to its employees, all policy decisions regarding the security function, the right to determine guard posts, the number of people to be employed for security, and the type and amount of equipment to be utilized rested solely with the Authority. Additionally, although the specific number of permanent posts and hours of duty of the security force were to be fixed jointly by the Authority and Pinkerton's, the Authority reserved the right to change or transfer the Pinkerton employees from one permanent post to the other, to change the hours of specific personnel and to approve or disapprove the number of employees engaged in the performance of the contract. Here, there was no proof offered whatsoever creating a factual issue as to whether Pinkerton's failed to comply with the terms of the contract or the directions and orders issued by the Authority. There is no proof that Pinkerton's did not employ the number of security guards required by the Authority or that the Authority required a permanent security guard in or around the area in which Rodriguez was assaulted and robbed. Moreover, there is not any evidence in the record to suggest that the deployment of the roving guards after the ninth race in order to direct the egress of approximately 18,000 to 20,000 cars from the Meadowlands complex was unreasonable.
Beyond this, even if we make the dubious assumption that the deployment of the roving guards to traffic duty was unreasonable and violative of the Authority security plan, there cannot be any reasonable causal connection between such decision and the assault and robbery of Rodriguez. This was simply a criminal act by third parties which could not have been prevented but for the most fortuitous presence of a security guard roving the massive complex at the precise moment of the crime. *47 Thus, we hold to the view that the trial judge properly granted summary judgment in favor of Pinkerton's.
Affirmed.