766 A.2d 786 (2001)
337 N.J. Super. 122
Walter J. O'CONNELL, Jr., Plaintiff-Appellant,
v.
NEW JERSEY SPORTS AND EXPOSITION AUTHORITY and New York Giants, Defendants-Respondents,
and
The National Football League, Defendants.
Superior Court of New Jersey, Appellate Division.
Argued January 23, 2001.
Decided February 14, 2001.
*787 Harold J. Ruvoldt, Jr., Asbury Park, argued the cause for appellant (Wolf, Block, Schorr and Solis-Cohen, attorneys; Mr. Ruvoldt, of counsel; Jordana Serebrenik, on the brief).
Paul J. Soderman, Fairfield, argued the cause for respondents (Zucker, Facher & Zucker, attorneys; Mr. Soderman, on the brief).
Before Judges CONLEY, WECKER and LESEMANN.
The opinion of the court was delivered by CONLEY, J.A.D.
During a New York Giants' (Giants) football game, plaintiff alleges in this personal injury litigation that he slipped and fell in the Giants Stadium stands because of snow and ice that had not properly been removed from the stadium stands' interior steps. His action against the National Football League was dismissed by consent. In two separate summary judgment orders, the complaints against the Giants and the New Jersey Sports and Exposition Authority (NJSEA) were dismissed. Plaintiff appeals the summary judgments; we reverse as to the Giants but affirm as to NJSEA.
Using his season ticket purchased from the Giants, plaintiff attended a football game at Giants Stadium on December 23, 1995. Several days before the game it had snowed. According to plaintiff's certification, accepted for the purposes of the motions,
When I arrived at the stadium, it appeared as though the aisles had, at some point, been cleared of some snow, however, accumulations of snow remained in the aisles. It appeared as well that in some areas snow had melted, and refroze, resulting in accumulations of ice in the aisles as well. In addition, snow was packed under the seats in the stands.
....
At approximately 2:45 p.m., during the 3rd quarter of the game, I got up to go to the bathroom, and while walking up the stairs, a fight broke out in the nearby seats. The aisles were covered with snow and ice. While I was walking up the stairs, a fight broke out in the seats. As I waited to pass, the fight spilled out into the aisle. I was pushed, slipped on the snow and ice on the steps, and was knocked down. Upon righting myself, I was again pushed by the crowd, slipped on the snow and ice, fell into the seating area, striking the seats and I fell to the ground.
It is undisputed that Giants Stadium is owned by NJSEA. The governing lease between NJSEA and the Giants identifies NJSEA as the "Lessor" and the Giants as the "Lessee." The lease specifies that the Giants leased from NJSEA "the premises described in Annex A hereof, except for portions of areas thereof which are reserved by Lessor for its exclusive use as set forth in Article VIII hereof." Annex A is not included in the appellate record. However, and at least for the purposes of the motions for summary judgment, we assume the stadium seats and steps are part of the premises leased by the Giants and are not included in the areas "reserved by [NJSEA] for its exclusive use...."
As to the agreement between NJSEA and the Giants concerning their respective maintenance obligations under the lease, Article XI of the lease provides in pertinent part:

*788 Section 11.1. Lessor, at its own cost and expense, will keep the demised premises in good order and repair and will make all reasonable replacements thereto necessary to keep the same in good condition for the intended use thereof by Lessee, and will provide the personnel necessary to supervise and operate the Football Stadium. Without intending hereby to limit the generality of the foregoing, Lessor will, at its own cost and expense:
....
(c) have seats clean and in working order at least three hours before the start of each football game held by Lessee at the Football Stadium;
....
(f) at least three hours prior to the start of each football game held by Lessee at the Football Stadium, have removed all refuse and garbage from the Football Stadium, stands and pedestrian areas;
....
(h) with respect to the areas of the Football Stadium occupied exclusively by Lessee, clean daily and remove refuse and garbage daily, as needed paint and furnish air-conditioning, electric power, hot and cold water, toilet supplies and window washing.
In addition, section 5.4 of Article V provides in part:
Lessor, at its own cost and expense, will... keep all such parking areas and pedestrian walks ... in good order, condition and repair at all times, and ... [will] sand or treat chemically when icy, remove snow and other debris (continuous snow removal on game days)....
The basis for the Giants' motion for summary judgment was its contention that, in light of the above lease provisions, NJSEA alone has control over maintenance and snow removal at the stadium, including removal of snow and ice from the stadium seats and steps. Factually, that is not necessarily clear from the lease provisions that appear in the record before us. While section 5.4 of Article V reposes sole responsibility in NJSEA over maintenance and snow removal, Article V concerns "parking area and pedestrian walks." The pedestrian walks referred to in Article V are the exterior pedestrian walks. While Article XI concerns maintenance responsibilities for the interior of the stadium, including seats and steps, the closest mention of snow removal is the "removal of all refuse and garbage." Whether that was intended to include snow and ice is at best ambiguous.
Construing the lease to repose in NJSEA exclusive maintenance responsibility over the stadium seats and the interior steps, the motion judge concluded that, therefore, the Giants owed no duty of care to plaintiff. In this respect, the judge said:
Now the issue here is whether the New York Giants owed a duty to Mr. O'Connell as a matter of law because they were lessees and had exclusive control of the stadium on the day in question. O'Connell has to prove that a duty was owed and that breach of that duty caused his injury, Starchan [Strachan] v. John F. Kennedy, 109 N.J. 523, 538 A.2d 346 (1988).
There is a recent Appellate Division decision which was attached to the papers, Slater v. Mundial Sports Group, [No. A-23-94T2 (App. Div. June 6, 1995) ].... The Appellate Court held that the sponsor in that caseand that's important according to Ms. Fleming between being a sponsor and a lesseenor the promoter of the Soccer cupI think it was a World Soccer Cupowed any duty to a security guard who was injured while working at Giants Stadium. The Trial Court ... and the Appellate Division both found that the promoter and sponsor did not owe a duty because the NJSEA had reserved responsibility for security to itself in the agreement between the parties.
....
*789 ... I believe the competent evidentiary materials presented show that the NJSEA is the party who controls the premises and, as they have reserved to themselves, control to provide appropriate maintenance at the stadium in East Rutherford.
... it's clear that the NJSEA has reserved to itself maintenance of the ... stadium,
....
They provide ushers, ticket sellers they have seats clean. They have to have refuse and garbage removed. They have to have continuous snow removal three hours before. I don't think that any reasonable juror would ... ever findif they have to have three hours of snow removal of pedestrian walkwaysthat ... the NJSEA would allow any lessee, Giants, Jets, Paylay [sic], or whoever plays there ... to come in with shovels and ... work around the steps. It's not logical on top of everything else.
I think that as a matter of law, the New York Giants did not owe a duty of care to Mr. O'Connell. I think that your cause of action is against the NJSEA and you may very well have a good cause of action there.
We disagree. To begin with, the lease provisions may arguably place, vis-a-vis lessor NJSEA and lessee Giants, snow removal responsibility upon NJSEA. But they most assuredly do not give to NJSEA exclusive control over the interior of the stadium, in particular stadium seats and steps. To the contrary, under Article VIII of the lease, the Giants "shall have the exclusive right and privilege ... to use and occupy the Football Stadium during each Football Season...." While the lease reserves to NJSEA "administrative and general maintenance space" located within the stadium, the stadium seats and steps are nowhere in the lease reserved to the exclusive control of NJSEA but would, rather, seem to be part of the premises subject to the Giants' control during the football season. And, while sections 8.3 and 8.4 of Article VIII permit certain uses of the stadium by NJSEA during the Giants football season, neither section covers the seats or steps during a Giants game.[1] To the contrary, the lease mandates that the Giants will "not discontinue its use of any major part of the Football Stadium which is intended or contemplated for use by stadium patrons unless the Lessor shall consent in writing to such discontinuance." Most certainly this includes the stadium seats and steps. Finally, while Article XI, section 11.1 might be read to *790 place responsibility upon NJSEA for snow and ice removal in the stadium seats and steps, that section expressly provides that "[w]henever after notice reasonable in the circumstances, Lessor shall fail to comply with any of its obligations provided in this Section 11.1, Lessee may ... cure the default...." Clearly then while the lease provisions may allocate the maintenance responsibilities and costs between the Giants and NJSEA, they do not divest the Giants of control over the areas within its leasehold, including the stadium seats and steps. Compare McBride v. Port Auth. of New York and New Jersey, 295 N.J.Super. 521, 522, 526-27, 685 A.2d 520 (App.Div. 1996) (commercial landlord which leased warehouse to injured employee's employer had no duty of care where the tenant employer had exclusive control of the premises); Milacci v. Mato Realty Co., Inc., 217 N.J.Super. 297, 301, 525 A.2d 1120 (App.Div.1987) (where tenant had exclusive control over the leased premises, landlord did not owe a duty of care to users of the premises). The judge's conclusion that "no reasonable juror would... ever find ... that ... the NJSEA would allow ... [the] Giants ... to come in with shovels and ... work around the steps ..." ignores the right of the Giants to do so if the NJSEA fails to properly clean the seats and steps of snow and ice.
At the time of his injury, plaintiff was a patron of the Giants, attending a Giants game in the Giants' leased stadium and using a seat reserved for him by virtue of his season ticket issued by the Giants. As to the plaintiff, the Giants clearly owed a duty of care. The general rule is that a tenant or lessee occupying premises to which third parties are invited owes a duty to use ordinary care to have the premises in a reasonably safe condition. See generally Bozza v. Vornado, Inc., 42 N.J. 355, 359, 200 A.2d 777 (1964); Bohn v. Hudson & Manhattan R.R. Co., 16 N.J. 180, 184-85, 108 A.2d 5 (1954); Ratering v. Mele, 11 N.J.Super. 211, 213, 78 A.2d 105 (App.Div.1951). This rule applies to places of public amusement. 27A Am.Jur.2d Entertainment and Sports Law § 6 (1996). Thus, a lease agreement between the lessor and lessee, or landlord and tenant, may fix the respective duties and allocate respective costs for repair and maintenance as between the lessor and lessee; however, no provision of a lease can absolve a lessee or tenant as against a third party from the tenant's duty to maintain the premises in a reasonably safe condition. Vasquez v. Mansol Realty Assoc., Inc., 280 N.J.Super. 234, 238, 655 A.2d 82 (App.Div. 1995). See Restivo v. Church of St. Joseph of Palisades, 306 N.J.Super. 456, 462, 703 A.2d 997 (App.Div.1997), certif. denied, 153 N.J. 402, 709 A.2d 796 (1998); Snyder v. I. Jay Realty Co., 53 N.J.Super. 336, 344, 147 A.2d 572 (App.Div.1958), aff'd, 30 N.J. 303, 153 A.2d 1 (1959); Jackson v. K-Mart Corp., 182 N.J.Super. 645, 651, 442 A.2d 1087 (Law Div.1981).
As was observed in Jackson v. K-Mart Corp., supra, 182 N.J.Super. at 651, 442 A.2d 1087:
The effect of the covenant to maintain is only to allocate costs between the tenant and the property owner. If the owner is under an obligation to maintain... and does not, the tenant may do so and then bring an action on the covenant for the cost of maintenance. Similarly, if a landlord negligently fails to make repairs required by the covenant and his tenant is consequently subjected to tort liability, the tenant may impose the consequences of that liability upon the landlord by crossclaim in the tort action or otherwise. As stated in McKeown v. King, supra,[ 99 N.J.L. 251, 122 A. 753 (1923)] however, the covenant absolves neither landlord nor tenant from liability to innocent third parties.

[Citation omitted.]
Both the motion judge and the Giants rely upon the unreported opinion in Slater v. Mundial Sports Group, Inc., No. A-23-94T2 (App. Div. June 6, 1995), and Bango v. Carteret Lions Club, 12 N.J.Super. 52, 79 A.2d 57 (App.Div.), certif. denied, 7 N.J. *791 347, 81 A.2d 522 (1951). The facts in both cases are inapposite. Slater involved the duty of care owed to a security guard employed by a security company hired by NJSEA to provide security during a two-day soccer event sponsored by defendant Mundial Sports Group. Mundial had a licensing agreement with NJSEA which allowed it to sponsor the two-day event. It was neither a tenant nor lessee inviting patrons to premises over which it exercised leasehold or tenancy rights. In determining that neither the sponsor nor the promoter of the event owed plaintiff employee a duty of care, we were not concerned with, nor even addressed, the governing legal principles applicable here. Similarly, in Bango v. Carteret Lions Club, supra, 12 N.J.Super. 52, 79 A.2d 57, defendants did no more than sponsor and advertise a soap box derby that was held on a public street. Plaintiff was the police officer on duty and was injured during the derby. In affirming the dismissal of the complaint, we noted that the defendant sponsors could not have exercised any authority or control over the conduct of the races. Id. at 56, 79 A.2d 57. That is not the case here. We thus reverse the summary judgment granted the Giants.
We reach a different conclusion as to the summary judgment granted NJSEA.[2] Plaintiff contends that, while NJSEA is a state agency, it is "not ... protected by the common-law immunity for snow removal activity" afforded to "governmental entities" because:
[I]t is apparent that the NJSEA, in the operation of the interior of Giants Stadium, is NOT engaged in a governmental function. (1) Operation of an arena that is leased to, among other entities, professional sports teams, is not the type of activity engaged in by local governments. (2) Such activity is not uniformly engaged in by public entities today, and (3) could readily be, indeed is uniformly, performed at least as well by a private entity.... (4) Operation of Giants Stadium is engaged in by the State for profit and revenue generating purposes.... (5) Finally, there is no imperative public duty imposed on the NJSEA as an agent of the State of New Jersey that requires it to operate Giants Stadium.... The operation of Giants Stadium is fundamentally a proprietary function that just happens to be owned by a State agency and is therefore not a governmental function intended to be protected by the common-law [snow-removal] immunity.
Given the clear legislative creation of the NJSEA and legislative intent that, while its sports and other events might produce revenues, the NJSEA should be considered as performing governmental functions, the motion judge properly rejected these contentions.
NJSEA was created in 1971 by the Legislature pursuant to N.J.S.A. 5:10-1 to -26. It is "a public body corporate and politic," and "an instrumentality of the State." N.J.S.A. 5:10-4(a). The Legislature expressly provided that NJSEA is to be considered as "an instrumentality of the State exercising public and essential governmental functions, and theexercise by ... [NJSEA] of the powers conferred by the act shall be deemed and held to be an essential governmental function of the State...." N.J.S.A. 5:10-4(a). One of NJSEA's "projects" authorized by the act is the construction, operation, maintenance and repair of "one or more stadiums" in the Hackensack Meadowlands "suitable for the holding of athletic contests or other sporting events." N.J.S.A. 5:10-6(a)(1). Under N.J.S.A. 5:10-6(a)(1), NJSEA can operate such a stadium project "either directly or indirectly through lessees, licensees or agents." Under N.J.S.A. 5:10-4(a), although NJSEA, obviously, produces revenue from such a project, such revenue *792 is "deemed and held to be applied in support of the government." NJSEA's operation of the Giants Stadium, then, cannot be considered proprietary even though its role vis-a-vis the Giants is as a lessor. Contrast B.W. King, Inc. v. Town of West New York, 49 N.J. 318, 326, 230 A.2d 133 (1967) ("where ... a municipality has acquired title to realty in furtherance of its taxing power and duty, and such land is not being actually employed or used for a public municipal purpose, the municipality has the same duties and liabilities ... as have private land owners"); Rossi v. Borough of Haddonfield, 297 N.J.Super. 494, 501-02, 688 A.2d 643 (App.Div.), aff'd o.b., 152 N.J. 43, 702 A.2d 1285 (1997).
Thus, it has been recognized that the "construction and maintenance of a sports and exposition complex" by NJSEA "is a valid public purpose and a proper governmental function." New Jersey Sports & Exposition Auth. v. McCrane, 119 N.J.Super. 457, 488-89, 292 A.2d 580 (Law Div. 1971), ("Health, recreation and sports are encompassed in and intimately related to the general welfare of a well-balanced state.... Public Financing is necessary, and the wide variety of recreational and other benefits flowing to that public render the function of the Sports Authority a proper governmental one. One of the tests of public use must surely be not so much how the use is furnished but rather the right of people to receive and enjoy its benefits."), aff'd as modified and remanded, 61 N.J. 1, 292 A.2d 545, appeal dismissed, 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1972). See e.g. Vanchieri v. New Jersey Sports & Exposition Auth., 104 N.J. 80, 85, 88, 514 A.2d 1323 (1986) ("NJSEA is a public entity within the meaning of the Tort Claims Act" and entitled to immunity from plaintiff's personal injury suit, although its independent contractor may not be); Zois v. New Jersey Sports & Exposition Auth., 286 N.J.Super. 670, 670 A.2d 92 (App.Div.1996) (affirming dismissal of plaintiff's complaint against NJSEA for failure to satisfy the notice of claims requirement of the Tort Claims Act); Rodriguez v. New Jersey Sports & Exposition Auth., 193 N.J.Super. 39, 42, 472 A.2d 146 (App.Div.1983), certif. denied, 96 N.J. 291, 475 A.2d 586 (1984) ("Tort claims against public entities, such as the Sports Authority, are governed by the provisions of the Tort Claims Act.").
Alternatively, plaintiff contends that the rationale prompting judicial continuance of the common-law snow removal immunity does not apply here, relying upon Bligen v. Jersey City Hous. Auth., 131 N.J. 124, 619 A.2d 575 (1993). We disagree.
The common-law immunity for the snow removal activities of public entities has long been recognized and, indeed, exists even though Tort Claims Act statutory immunities may not apply. Rochinsky v. State, 110 N.J. 399, 402, 405, 414, 541 A.2d 1029 (1988). Bligen v. Jersey City Hous. Auth., supra, 131 N.J. 124, 619 A.2d 575, created an exception for public housing authorities.
In Bligen, supra, plaintiff lived in a rented apartment in a complex that was owned by the Jersey City Housing Authority (JCHA). This complex was described as follows:
The 7.62 acre complex has six apartment buildings and a recreation area. An entrance located at the east end provides access to an internal driveway. The semi-circular driveway, which leads out to Duncan Avenue, varies in width from eighteen to twenty-one feet and crosses the outer edge of the property. Parking spaces are perpendicular to the length of the driveway, and walkways lead from the parking spaces to the apartment buildings.

[131 N.J. at 126, 619 A.2d 575.]
The plaintiff "slipped and fell on ice in the driveway outside of her apartment building," as she was "stepping off the curb in the parking area." Id. at 127, 619 A.2d 575. Although JCHA was a public entity, the Supreme Court concluded that, unlike other public entities, the common-law immunity for snow removal activities did *793 not apply as its territorial jurisdiction was finite and, as a matter of common law, public housing authorities had always been subject to the same duty of care as had private landlords, id. at 131, 133-34, 135-36, 619 A.2d 575, a result that former Justice Clifford in his dissent considered a "snow job," id. at 139, 619 A.2d 575.
We cannot accept plaintiff's contention that Bligen should be extended beyond its unique facts. First, even the Court in Bligen understood the "narrow scope" of its decision. 131 N.J. at 138, 619 A.2d 575. Second, while the area encompassed by the stadium seats and steps may be considered a "finite area," the seats and steps are not NJSEA's only area of responsibility. The record does not disclose the entire area subject to NJSEA control, but we can take notice that this area includes the entire Meadowlands Sports Complex, which contains not only Giants Stadium but the Meadowlands Racetrack and the Continental Airlines Arena along with all of the surrounding roadway and parking facilities.
In this respect, our decision in Sykes v. Rutgers, the State Univ. of New Jersey, 308 N.J.Super. 265, 705 A.2d 1241 (App. Div.1998), is instructive. There, plaintiff was a student at Rutgers who lived in a dormitory apartment complex on Rutgers' Busch Campus in New Brunswick. While in the dormitory parking lot, she slipped and fell on an accumulation of ice. Rutgers moved for summary judgment on the basis of common-law snow removal immunity. The motion judge thought Bligen applied and denied the motion. We disagreed. Judge (now Justice) Long explained:
Sykes argues that while the total area under Rutgers control may be larger than that of the area controlled by the housing authority in Bligen, the "internal parking lot" in which she fell is analogous to Bligen because it is a "finite, bounded area" from which to remove snow. We disagree. To us, there is nothing in Bligen to suggest that the Supreme Court intended its "finite, bounded area" characterization of the seven-acre housing authority there to allow a slip and fall plaintiff to fractionalize a 1500 acre college campus. Sykes' argument that the scope and size of Rutgers' Busch Campus can be ignored by focusing only on the part of the campus "dedicated to student housing" would enable slip and fall plaintiffs to effectively dissect any public entity into its constituent "finite, bounded areas" for purposes of avoiding common law snow-removal immunity. This would, in effect, destroy the common law immunity which has protected public entities against liability for their snow-removal activities for over a quarter of a century. See Miehl v. Darpino, supra[ 53 N.J. 49, 247 A.2d 878 (1968)]. Indeed, under her reasoning, any municipality which is smaller or similar in size to Rutgers could be subjected to liability with respect to "finite, bounded areas" of hardscape supporting its public buildings.

[Id. at 268-69, 705 A.2d 1241.]
Plaintiff's reliance, then, upon the "finite area" of the interior of the Giants Stadium cannot support an extension of Bligen to NJSEA's common-law snow removal immunity.
In addition, plaintiff cites no cases, nor have we found any, which equate NJSEA to private landlords/lessors insofar as potential liability for injuries sustained upon its property. We decline, therefore, to extend to NJSEA Bligen`s alternative basis for its holding that public housing authority landlords may not rely upon the common-law snow removal immunity.
Accordingly, we reverse summary judgment granted the Giants but affirm summary judgment granted NJSEA. We remand for further proceedings consistent with this opinion.
NOTES
[1] In this respect, section 8.3 provides:

Lessor shall have the right to use and occupy the Football Stadium and to receive the rents, fees and profits therefrom at the times and on the conditions set forth hereinafter in this Section; provided, however, that in no event shall Lessor have the right to use or occupy the Football Stadium during the Football Season if such use or occupancy would prevent, delay or otherwise interfere with the timely and proper restoration of the Football Stadium, including the playing field, for Lessee's next use thereof. Lessor shall have the right of such use and occupancy of the Football Stadium during the Football Season during the following periods: (i) after 5:00 p.m. on each day of the week, except Saturdays and Sundays, (ii) after 5:00 p.m. on each Saturday preceding a home game day and after 12:00 noon on other Saturdays, and (iii) on each Sunday Lessee does not hold a football game in the Football Stadium, subject in any event to Lessee's exclusive right to use the Football Stadium for any regular season home game of which Lessor shall have received notice form the Lessee pursuant to Section 8.5. Lessor shall give Lessee timely written notice of any such proposed use by it or others of the Football Stadium during the Football Season.
Section 8.4 provides:
Except as to those areas described in Section 8.2 for exclusive use by Lessee[,] Lessor shall have the right to the use and occupancy of the Football Stadium during all periods not within the Football Season and to receive rents, fees and profits therefrom, except that Lessor upon request by Lessee shall permit Lessee to use the playing field of the Football Stadium at times which do not conflict with scheduled events of Lessor for training purposes or observing prospects for Lessee's football team.
[Emphasis added.]
[2] In view of what appears to be an indemnification agreement between NJSEA and the Giants pursuant to which the Giants have asserted a cross-claim against NJSEA, our affirmance may be of little financial help to NJSEA.